1  BROOKE KILLIAN KIM (CA Bar No. 239298)
   brooke.kim@dlapiper.com
2  DLA PIPER LLP (US)
   4365 Executive Drive, Suite 1100
3  San Diego, CA 92121-2133
   Tel:   858.677.1400
4  Fax:   858.977.1401

5  GREGORY G. SPERLA (CA Bar No. 278062)
   greg.sperla@dlapiper.com
6  DLA PIPER LLP (US)
   555 Mission Street, Suite 2400
7  San Francisco, CA 94015-2933
   Tel:   (415) 836-2500
8  Fax:   (415) 836-2501

9  CONNOR M. SCOTT (CA Bar No. 321714)
   connor.scott@us.dlapiper.com
10 DLA PIPER LLP (US)
   2000 Avenue of the Stars
11 Suite 400, North Tower
   Los Angeles, CA 90067-4735
12 Telephone:   (310) 595-3000
   Facsimile:   (310) 595-3300
13
   Attorneys for Defendants
14 **L'ORÉAL USA, INC. AND
   L'ORÉAL USA PRODUCTS, INC.**
15

16              UNITED STATES DISTRICT COURT

17             CENTRAL DISTRICT OF CALIFORNIA

18

| | |
|---|---|
| 19  HOLLY WHITE, individuals, and as Successor-In-Interest of BEVERLY WHITE, Deceased; | CA  SE NO. 2:25-cv-4044 |
| 20 | **DECLARATION OF BROOKE KIM IN SUPPORT OF NOTICE OF DEFENDANTS L'ORÉAL USA, INC. AND L'ORÉAL USA PRODUCTS, INC. OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. §§ 1332, 1441, AND 1446** |
| 21              Plaintiff, | |
| 22       v. | |
| 23  L'ORÉAL USA, INC., L'ORÉAL USA PRODUCTS, INC., WELLA PROFESSIONALS, INC., COTY, INC., CLAIROL, KOHLBERN KRAVIS ROBERT & CO. a/k/a KKR & CO., INC., BRISTOL-MYERS SQUIBB, PROCTER & GAMBLE HAIR CARE, LLC, JOICO, SCHWARZKOPF, PRAVANA, HENKEL a/k/a HENKEL AG & CO. KgaA, GOLDWELL NEW YORK, COSMOPROF SERVICES USA, LLC, | *[Filed concurrently with Notice of Removal]*<br><br>Complaint Filed: 04/23/2025<br>Amended Complaint Filed: 04/28/2025 |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

1  | SALLY BEAUTY HOLDINGS, INC.,
2  | GOLDWELL, KAO CORPORATION,
   | JOHN PAUL MITCHELL SYSTEMS, and
3  | JOHN DOE CORPORATIONS 1-100;
4  |            Defendants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Brooke Kim, declare as follows:

1.     I am an attorney at the law firm DLA Piper LLP (US), counsel for Defendants L'Oréal USA, Inc. and L'Oréal USA Products, Inc. in the above-captioned lawsuit. I am duly licensed to practice law in the State of California.

2.     I submit this declaration in support of Defendants' Notice of Removal.

3.     I am over the age of 18 years old, I have personal knowledge of the facts set forth in this Declaration, and, if called as a witness, could and would competently testify thereto.

4.     Defendants L'Oréal USA, Inc. and L'Oréal USA Products, Inc. have not been served in this action.

5.     Attached hereto as **Exhibit A** is a true and correct copy of the Complaint, filed with the Los Angeles Superior Court on April 23, 2025.

6.     Attached hereto as **Exhibit B** is a true and correct copy of the Alternate Dispute Resolution Packet, filed with the Los Angeles Superior Court on April 23, 2025.

7.     Attached hereto as **Exhibit C** is a true and correct copy of the Civil Case Cover Sheet, filed with the Los Angeles Superior Court on April 25, 2025.

8.     Attached hereto as **Exhibit D** is a true and correct copy of the Amended Complaint, filed with the Los Angeles Superior Court on April 28, 2025.

9.     Attached hereto as **Exhibit E** is a true and correct copy of the Summons on Complaint, filed with the Los Angeles Superior Court on April 29, 2025.

10.    Attached hereto as **Exhibit F** is a true and correct copy of the Certificate of Mailing: Complex Determination, filed with the Los Angeles Superior Court on April 30, 2025.

11.    Attached hereto as **Exhibit G** is a true and correct copy of the Minute Order Re: Complex Determination, filed with the Los Angeles Superior Court on April 30, 2025.

DECLARATION OF BROOKE KIM ISO NOTICE OF REMOVAL
CASE NO. 2:25-cv-4044

1620073377.1

12.     Attached hereto as **Exhibit H** is a true and correct copy of the Certificate of Mailing: Complex Determination, filed with the Los Angeles Superior Court on May 1, 2025.

13.     Attached hereto as **Exhibit I** is a true and correct copy of the Certificate of Mailing: Initial Status Conference Order, filed with the Los Angeles Superior Court on May 2, 2025.

14.     Attached hereto as **Exhibit J** is a true and correct copy of the Initial Status Conference Order, filed with the Los Angeles Superior Court on May 2, 2025.

15.     Attached hereto as **Exhibit K** is a true and correct copy of the Minute Order Re: Newly Assigned Case, filed with the Los Angeles Superior Court on May 2, 2025.

16.     L'Oréal USA, Inc. and L'Oréal USA Products, Inc. are each incorporated in Delaware and maintain a principal place of business in New York, New York.

17.     All real Defendant entities named in this lawsuit have not been served or have consented to removal.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on May 6, 2025, in Poway, California.

_____
BROOKE K. KIM

DECLARATION OF BROOKE KIM ISO NOTICE OF REMOVAL
CASE NO. 2:25-cv-4044

1620073377.1

# EXHIBIT A

Andrew Parker Felix (SBN 276002)
MORGAN & MORGAN, P.A.
633 West Fifth Street, Suite 2200
Los Angeles, CA 90071
Telephone: (407) 244-3209
Facsimile: (407) 245-3334
andrew@forthepeople.com

R. Allen Smith, Jr. (*pro hac vice forthcoming*)
THE SMITH LAW FIRM, PLLC
300 Concourse Blvd., Suite 104
Ridgeland, MS 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426
Email: asmith@smith-law.org
*Attorneys for Plaintiff*

Electronically FILED by
Superior Court of California,
County of Los Angeles
4/23/2025 3:57 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By G. Carini, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| HOLLY WHITE, Individually, and as Successor-In-Interest of BEVERLY WHITE, Deceased<br><br>          Plaintiff,<br><br>vs.<br><br>L'ORÉAL USA, INC., a Delaware Corporation doing business in California,<br><br>L'ORÉAL USA PRODUCTS, INC., a Delaware Corporation doing business in California,<br><br>WELLA OPERATIONS US, LLC, a Delaware Corporation doing business in California,<br><br>COTY, INC., a Delaware Corporation doing business in California, | Case No.: 25STCV12023<br><br>Department: _____<br><br>Judge: _____<br><br>**COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL:**<br><br>1. **Strict Liability – Failure to Warn**<br>2. **Strict Liability – Design Defect – Risk-Utility Test**<br>3. **Strict Liability – Design Defect – Consumer Expectations Test**<br>4. **Negligent Failure to Warn**<br>5. **Deceit by Concealment**<br>6. **Violations of California Unfair Competition Law (UCL)**<br>7. **Wrongful Death**<br>8. **Survival** |

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL                    PAGE 1 OF 42

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLAIROL, a Connecticut Corporation doing business in California,

KOHLBERG KRAVIS ROBERT & CO. a/k/a KKR & CO., INC., a Delaware Corporation doing business in California,

BRISTOL-MYERS SQUIBB, a Delaware Corporation doing business in California,

PROCTER & GAMBLE HAIR CARE, LLC, A Delaware Corporation doing Business in California,

JOICO, a California Corporation doing business in California,

SCHWARZKOPF, a German Corporation doing business in California,

PRAVANA, a California Corporation doing business in California,

HENKEL a/k/a HENKEL AG & Co. KGaA, a German Corporation doing business in California,

GOLDWELL NEW YORK, a foreign company doing business in California,

COSMOPROF SERVICES USA, LLC, a California company doing business in California,

SALLY BEAUTY HOLDINGS, INC., a Texas Corporation doing business in California,

GOLDWELL, a foreign company doing business in California,

KAO CORPORATION, a foreign Corporation doing business in California,

JOHN PAUL MITCHELL SYSTEMS, a

California Corporation doing business in
California, and

JOHN DOE CORPORATIONS 1-100,
inclusive,

      Defendants.

Plaintiff HOLLY WHITE herein (referred to as "Plaintiff"), by and through counsel, for her causes of action against the Defendants, files the herein Complaint and alleges as follows:

## I.    PARTIES

1.    Plaintiff HOLLY WHITE is a competent individual, over the age of 18, a Citizen of the United States, and a resident of Marion County in the state of Indiana.  Plaintiff is the surviving child, heir, and successor-in interest of Decedent BEVERLY WHITE. As successor-in-interest, HOLLY WHITE has standing in a representative capacity as the heir to bring actions on behalf of the heir for survival and wrongful death pursuant to the laws of the State of California.  Decedent BEVERLY WHITE was a licensed cosmetologist from 1960 until her retirement in May of 2003.

2.    All claims in this action are a direct and proximate result of the negligent, willful, and wrongful acts and/or omissions of Defendants and/or their corporate predecessors in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the products by L'ORÉAL USA, INC.; L'ORÉAL USA PRODUCTS, INC.; WELLA PROFESSIONALS; COTY, INC.; CLAIROL; KOHLBERG KRAVIS ROBERT & CO. a/k/a KKR & CO., INC.; BRISTOL-MYERS SQUIBB; PROCTER & GAMBLE HAIR CARE, LLC; JOICO; SCHWARZKOPF; PRAVANA; HENKEL; GOLDWELL; JOHN PAUL MITCHELL SYSTEMS; PAUL MITCHELL; and JOHN DOE CORPORATIONS 1-100; known as, Paul Mitchell, Wella, Redken, Matrix, Color Gel, Color Charm, Clairol Professional, Lumishine, Palette, Top Chic, So Color, Color XG, and The Color (hereinafter "the PRODUCTS").  Plaintiff in this action seeks recovery for damages as a result of developing bladder cancer, which was directly and proximately caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature of hair dyes, and the attendant effects of developing bladder cancer.  All of the claims in this action involve common legal, common factual, and common medical issues.

3.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant L'ORÉAL USA, INC., is a corporation doing business in and authorized to do business in the state of California, and was incorporated in Delaware.  L'ORÉAL USA, INC.,

---

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL                    PAGE 4 OF 42

is a subsidiary of the French cosmetics giant L'Oréal S.A., the world's largest cosmetic company.

4.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant L'ORÉAL USA, INC., maintains an office and principal place of business and headquarters located at 10 Hudson Yards, New York, New York 10001, and process may be served upon its registered agent, Corporation Service Company which does business in California as CSC- Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

5.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant L'ORÉAL USA, INC., is engaged in the manufacturing, packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.  In addition to manufacturing and distributing products using the "L'Oréal" brand, L'Oréal also manufactures and distributes products using the "Redken" and "Matrix" brand, including Cosmetic Products at issue here, throughout the United States.

6.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant L'ORÉAL USA PRODUCTS, INC., is a corporation doing business in and authorized to do business in the state of California, with its principal place of business and headquarters at 10 Hudson Yards, New York, New York 10001, and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

7.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant L'ORÉAL USA PRODUCTS, INC., is engaged in the manufacturing, packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.  In addition to manufacturing and distributing products using the "L'Oréal" brand, L'Oréal also manufactures and distributes products using the "Redken" and "Matrix" brand, including Cosmetic Products at issue here, throughout the United States.

8.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant MATRIX PROFESSIONAL HAIR is part of L'ORÉAL USA, INC.'s Professional Products Division.  MATRIX was founded in 1980 and acquired by L'ORÉAL USA, INC. in 2000.

9.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant REDKEN is part of L'ORÉAL USA, INC.'s Professional Products Division.  REDKEN was founded in 1960 and acquired by L'ORÉAL USA, INC. in 1993.

10.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant WELLA PROFESSIONALS, is a corporation doing business in and authorized to do business in the State of California, with its principal place of business and headquarters at 10 Hudson Yards, New York, New York 10001, and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

11.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant COTY, INC., is a corporation doing business in and authorized to do business in the State of California, and was incorporated in Delaware. COTY, INC., is an American multinational beauty company founded in 1904 by Francois Coty.

12.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant COTY, INC., maintains an office and principal place of business and headquarters located at 350 Fifth Avenue, New York, New York 10118, and process may be served upon its registered agent, Corporation Service Company which does business in California as CSC- Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

13.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant COTY, INC., is engaged in the manufacturing, packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.  In addition to manufacturing and distributing products using the "Coty" brand, Coty also manufactures and distributes products using the "Wella" and "Clairol" brand, including Cosmetic Products at issue here, throughout the United States.

14.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant WELLA is part of COTY, INC.'s Professional Products Division.  WELLA was founded in 1880 and acquired by COTY, INC., in 2015.  In 2020, COTY, INC., sold a stake in the WELLA brand to the private equity firm, KKR & CO., INC., while retaining percentages

of the stake.  In 2021, COTY, INC., sold additional percentages of stakes in WELLA to KKR & CO., INC., while continuing to retain percentages of the stake in WELLA.  In 2023 COTY, INC., sold a stake in WELLA to the investment firm of IGF WEALTH MANAGEMENT with COTY retaining percentages in WELLA.

15.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant WELLA is a Delaware corporation that maintains a corporate office and principal place of business and headquarters located at 350 Fifth Avenue, New York, New York 10118, and process may be served upon its registered agent, Corporation Service Company which does business in California as CSC- Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

16.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant CLAIROL is part of the personal care-product division of WELLA that specializes in hair coloring and hair care.  WELLA is part of COTY, INC.'s Professional Products Division.  CLAIROL was founded in 1931 and acquired by COTY, INC., in 2016.  In 2020, COTY, INC., sold a stake in the CLAIROL brand to the private equity firm, KKR & CO., INC., while retaining percentages of the stake.

17.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant CLAIROL maintains a corporate office located at 1 Blachley Road, Stamford, Connecticut 06922.  CLAIROL, as part of COTY, INC., is a Delaware corporation that maintains a corporate office and principal place of business and headquarters located at 350 Fifth Avenue, New York, New York 10118, and process may be served upon its registered agent, Corporation Service Company which does business in California as CSC- Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

18.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant KOHLBERG KRAVIS ROBERTS & CO., a/k/a KKR & CO., INC., is a corporation doing business in and authorized to do business in the State of California, and was incorporated in Delaware.  KOHLBERG KRAVIS ROBERTS & CO., a/k/a KKR & CO., INC., is a global investment company that acquired the majority stake in WELLA and CLAIROL in

2020.

19.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant KOHLBERG KRAVIS ROBERTS & CO., a/k/a KKR & CO., INC., maintains an office and principal place of business and headquarters located at 9 West 57th Street, Suite 4200, New York, New York 10019, and process may be served upon its registered agent, Corporate Creations Network, Inc., 7801 Folsom Blvd., #202, Sacramento, California 95826.

20.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant CLAIROL was sold to BRISTOL-MYERS in 1957.  BRISTOL-MYERS merged with SQUIBB CORPORATION to form BRISTOL-MYERS SQUIBB in 1989. PROCTER & GAMBLE purchased the CLAIROL division from BRISTOL-MYERS SQUIBB in 2001.  BRISTOL-MYERS SQUIBB is a corporation doing business in and authorized to do business in the State of California, and was incorporated in Delaware.

21.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant BRISTOL-MYERS SQUIBB maintains an office and principal place of business and headquarters located at Route 206 and Province Line Road, Princeton, New Jersey 08543, and process may be served upon its registered agent, CT Corporation System, 330 North Brand Boulevard, Glendale, California 91203.

22.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant PROCTER & GAMBLE purchased the CLAIROL division from BRISTOL-MYERS SQUIBB in 2001. In 2016 CLAIROL was acquired by COTY from PROCTER & GAMBLE as part of a beauty brand acquisition.  PROCTER & GAMBLE is a corporation doing business in and authorized to do business in the State of California, and was incorporated in Delaware.

23.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant PROCTER & GAMBLE HAIR CARE, LLC, is a subsidiary of PROCTER & GAMBLE and maintains an office and principal place of business and headquarters located at 1 Procter & Gamble Plaza, Cincinnati, Ohio 45202, and process may be served upon its registered agent, CT Corporation System, 330 North Brand Boulevard, Glendale, California 91203.

24.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant PRAVANA was founded by Steve Goddard in 2004, and in 2017 was acquired by HENKEL a/k/a HENKEL AG & Co. KGaA (hereinafter referred to as "HENKEL"). The acquisition comprised of leading hair professional brands such as PRAVANA.

25.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant PRAVANA maintains an office and principal place of business and headquarters located at 5800 Bristol Parkway, Suite 7, Culver City, California 90230.  PRAVANA, as a division of HENKEL, may be served through its parent company, HENKEL, upon its registered agent, Corporation Service Company which does business in California as CSC- Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

26.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant JOICO was founded by Steve Stefano and in 2001 was acquired by Zotos International, Inc., which is also a subsidiary of Shiseido Company, Limited.  Thereafter, in 2017, HENKEL acquired Zotos International, Inc., the North American Hair Professional business of Shiseido Company, Limited.  The acquisition comprised of leading hair professional brands such as JOICO and Zotos Professional.

27.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant JOICO maintains an office and principal place of business and headquarters located at 5800 Bristol Parkway, Culver City, California 90230.  JOICO, as a division of HENKEL, may be served through its parent company, HENKEL, upon its registered agent, Corporation Service Company which does business in California as CSC- Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

28.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant SCHWARZKOPF, INC. (hereinafter referred to as "SCHWARZKOPF"), was founded by Hans Schwarzkopf in 1898 and in 2015 was acquired by HENKEL.

29.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant SCHWARZKOPF maintains an office and principal place of business and headquarters located at 5800 Bristol Parkway, Culver City, California 90230. SCHWARZKOPF,

as a division of HENKEL, may be served through its parent company, HENKEL, upon its registered agent, Corporation Service Company which does business in California as CSC-Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

30.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant HENKEL maintains an office and principal place of business and headquarters located at One Henkel Way, Rocky Hill, Connecticut 06067, and process may be served upon its registered agent, Corporation Service Company which does business in California as CSC-Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

31.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendants JOICO, as a division of HENKEL, PRAVANA, SCHWARZKOPF and HENKEL are engaged in the manufacturing, packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.

32.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant GOLDWELL NEW YORK was founded by Hans and Steven Neumaier in 1976 and was acquired by COSMOPROF SERVICES USA, LLC (hereinafter referred to as "COSMOPROF")  in 2005. On September 1, 2023, COSMOPROF was acquired by parent company SALLY BEAUTY HOLDINGS, INC (hereinafter referred to as "SALLY BEAUTY"). SALLY BEAUTY  maintains an office and a principal place of business at its headquarters located at 3001 Colorado Boulevard, Denton, Texas 76210.

33.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant GOLDWELL NEW YORK maintains an office and principal place of business and headquarters located at 2117 Brighton Henrietta Town Line Road, Rochester, New York 14623. GOLDWELL NEW YORK, as a division of COSMOPROF, may be served through Denise Paulonis, Chief Executive Officer, of its parent company, SALLY BEAUTY,  at its headquarters located at 3001 Colorado Boulevard, Denton, Texas 76210.

34.     Plaintiff is informed and believes, and based thereon alleges, that at all times

relevant Defendant COSMOPROF maintains an office and principal place of business and headquarters at 4823 Promenade Parkway, Bessemer, Alabama 35022. COSMOPROF, as a division of SALLY BEAUTY, may be served through Denise Paulonis, Chief Executive Officer, of its parent company, SALLY BEAUTY, at its headquarters located at 3001 Colorado Boulevard, Denton, Texas 76210.

35.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant SALLY BEAUTY maintains an office and principal place of business and headquarters at 3001 Colorado Boulevard, Denton, Texas 76210. SALLY BEAUTY may be served through Denise Paulonis, Chief Executive Officer, at 3001 Colorado Boulevard, Denton, Texas 76210.

36.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendants GOLDWELL NEW YORK, COSMOPROF, and SALLY BEAUTY are engaged in the manufacturing, packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.

37.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant GOLDWELL was founded by Hans Erich Dotter in 1948. In 1989 GOLDWELL sold a 75% stake of its company to KAO CORPORATION. In 1994 KAO CORPORATION acquired the remaining 25% stake in GOLDWELL. GOLDWELL, as a division of KAO CORPORATION, may be served through Karen B. Frank, Key Principal, of its parent company, KAO CORPORATION, at its United States headquarters located at 2535 Spring Grove Avenue, Cincinnati, Ohio 45214.

38.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant KAO CORPORATION maintains an office and principal place of business and headquarters located at 2535 Spring Grove Avenue, Cincinnati, Ohio 45214. KOA CORPORATION may be served through Karen B. Frank, Key Principal, at its United States headquarters located at 2535 Spring Grove Avenue, Cincinnati, Ohio 45214.

39.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendants GOLDWELL and KAO CORPORATION are engaged in the manufacturing,

packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.

40.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant JOHN PAUL MITCHELL SYSTEMS (hereinafter referred to as "JPMS"), is a corporation doing business in and authorized to do business in the state of California, and was incorporated in California. JPMS, was founded in 1980 and is a manufacturer of hair care producing and styling tools through several brands, including Paul Mitchell.

41.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant JPMS, maintains an office and principal place of business and headquarters located at 20705 Centre Pointe Parkway, Santa Clarita, California 91350, and process may be served upon its registered agent, CT Corporation System, 330 North Brand Boulevard, Suite 700, Glendale, California 91203.

42.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant JPMS, is engaged in the manufacturing, packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.  In addition, JPMS manufactures and distributes products using the "Paul Mitchell" brand, including Cosmetic Products at issue here, throughout the United States

43.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the true names or capacities, whether individual, corporate, or otherwise, of JOHN DOE CORPORATIONS 1-100, inclusive, are unknown to the Plaintiff at the time of original filing of the underlying complaint in this action and, therefore, sues said Defendants by such fictitious names.  Plaintiff prays leave to amend this Complaint to show their true names and capacities and/or bases for liability when the same have been finally determined.

44.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the true names or capacities, whether individual, corporate, or otherwise, of JOHN DOE CORPORATIONS 1-100, inclusive, remain unknown to Plaintiff and, therefore Plaintiff sues said Defendants by such fictitious names.  Plaintiff is informed and believes and based thereon alleges that each of the Defendants designated herein by fictitious names is some manner legally

responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to Plaintiff as alleged herein.

45.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the true names or capacities, whether individual, corporate, or otherwise, of JOHN DOE CORPORATIONS 1-100, inclusive, and Other Defendants named by Plaintiff are collectively referred to herein as "Defendants" and all acts and omissions of Defendants as alleged herein were undertaken by each of the Defendants or said Defendants' agents, servants, employees, and/or owners, acting in the course and scope of its respective agencies, services, employments and/or ownerships.

46.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant to this action, all Defendants were engaged in the research, development, manufacture, design, testing, sale, and marketing of the PRODUCTS, and introduced such products into interstate commerce with knowledge and intent that such products be sold in the State of California.

47.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times material hereto, Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective products, including but not limited to the following:

a.    L'Oreal

b.    Matrix

c.    Redken

d.    Wella

e.    Clairol

f.    Joico

g.    Pravana

h.    Schwarzkopf

i.    Goldwell

j.    Paul Mitchell

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL                    PAGE 13 OF 42

48.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times material hereto, Defendants marketed these products to the general public and sold both to retail outlets and distributors throughout the world.

49.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times material hereto, Defendants have engaged in substantial, continuous economic activity in California, including marketing, distribution, and sale of billions of dollars in products to the public in California, including but not limited to the aforementioned products, that said activity by Defendants is substantially connected to the Plaintiff's claims as alleged herein.

50.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times material hereto, Defendants' defective hair products were placed into the stream of interstate commerce and which Decedent was exposed from approximately 1960 to approximately 2003.

51.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times material hereto, Decedent worked in a salon as a professional hair dresser/cosmetologist for approximately 43 years thus exposing Decedent to said PRODUCTS from approximately 1960 until she retired in May of 2003.

52.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times material hereto, Decedent worked in a salon as a professional hair dresser/cosmetologist working with and/or around said PRODUCTS through her normal day to day duties as a professional hair dresser/cosmetologist. In her capacity as a professional hair dresser/cosmetologist, Decedent worked coloring hair at least two to three times a day for five days a week that exposed her to said PRODUCTS on a daily basis from approximately 1960 through approximately 2003.

53.    Upon information and belief, beginning in approximately 1960, Decedent, while a citizen in the state of Indiana, was exposed to PRODUCTS purchased by or through the salon where she was employed, Futuristic Salon. Prior to her death, Decedent was further exposed by mixing, applying, cleaning, inhaling, and removing hair color PRODUCTS and any residue from bowls, brushes, towels, sinks, and tabletops, on a daily basis throughout her time spent in hair

salons and while employed in hair salons from approximately 1960 through approximately 2003.

54.    Plaintiff is informed and believes, and based thereon alleges, that in November of 2024 Decedent was diagnosed with bladder cancer resulting in her subsequent death on January 20, 2025, and suffered effects and sequelae therefrom, caused by her regular and prolonged use and exposure to chemicals in the PRODUCTS while a citizen and resident of the state of Indiana, which was a direct and proximate result of the unreasonably dangerous and defective nature of the Defendants' hair color PRODUCTS and the chemicals contained therein, and Defendants' wrongful and negligent conduct in the research, development, testing, manufacture, production, formulation, processing, packaging, promotion, distribution, marketing and sale of the PRODUCTS.

55.    Upon information and belief, as a direct and proximate result of the injuries alleged herein, Plaintiff has incurred medical expenses and other special damages which survive the death of the Decedent. Prior to her death, Decedent endured pain and suffering, loss of enjoyment of life, and death. Plaintiff has otherwise been damaged in a personal and pecuniary nature.

56.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, all allegations concerning Defendants includes Defendants' parent companies, subsidiaries, affiliates, divisions, franchises, partners, joint ventures, organizational units of any kind, predecessors, successors and assigns, and their officers, directors, employees, agents, representatives, and any and all other persons acting on behalf of Defendants.

57.    Plaintiff is informed and believes, and based thereon alleges that, all claims in this action are a direct and proximate result of Defendants' and/or their corporate predecessors negligent, willful, and wrongful conduct by Defendants' design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling and/or sale of the PRODUCTS.

## <u>JURISDICTION AND VENUE</u>

58.    This Court has subject matter jurisdiction over this action pursuant to Article 6, Section 10 of the Constitution of the State of California.

59.    This Court has personal jurisdiction over Defendants because they are authorized to do business and they do conduct business in California, have specifically marketed, advertised,

---

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL                    PAGE 15 OF 42

and made substantial sales in California, and have sufficient minimum contacts with this state and/or sufficiently avails themselves of the markets of this state through their promotion, sales, and marketing within this state to render the exercise of jurisdiction by this Court permissible.

60.    Venue is proper in this Court because one or more of the Defendants resides and maintains its principal place of business in Los Angeles County, California and the convenience of the witnesses and the ends of justice will be promoted by allowing this case to proceed in Los Angeles County, California.

61.    Defendants' PRODUCTS were all sold either directly or indirectly, to members of the general public within the State of California.

62.    At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within the United States and the State of California.

## II.    FACTUAL ALLEGATIONS

### A.    Products at Issue

63.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

64.    There are at least ten products at issue in this case manufactured and marketed by Defendants during this time period.

65.    Upon information and belief, at all relevant times alleged herein, Defendants advertised and marketed the PRODUCTS as safe for use.

66.    Decedent was exposed to the PRODUCTS while spending time in a salon and while working in a salon.  This was an intended and foreseeable use of the PRODUCTS based on the advertising, marketing, and labeling of the PRODUCTS.

### B.    FDA Regulation of Cosmetics

67.    Cosmetics marketed in the United States must comply with the Federal Food, Drug, and Cosmetic Act (FD&C Act), and Fair Packaging and Labeling Act (FP&L Act).  The FD&C Act defines cosmetics as articles intended to be applied to the human body for cleansing, beautifying, promoting attractiveness, or altering appearance without affecting the body's structure or functions.  Hair Dyes are included in this definition.

68.     The label statements required under the authority of the FD&C Act must appear on the inside as well as the outside container or wrapper. The labeling requirements are codified at 21 CFR 701 and 740.  Cosmetics not labeled in accordance with the requirements may be considered misbranded and may be subject to regulatory action.

69.     Cosmetics must bear warning labels prescribed by (21 CFR 740).  The warning label on a cosmetic must be appropriate and contain adequate directions for safe use.  The warning label on a cosmetic must be prominent and conspicuous.  Specifically, 21 CFR §740.1(a) establishes warning statements for cosmetics such as hair dye.  The Code states "The label of a cosmetic product **shall** bear a warning statement whenever necessary or appropriate to prevent a health hazard that **may be** associated with the product."

70.     The cosmetic industry is self-regulated by manufacturers of cosmetic products. The FD&C Act does not require cosmetics, including hair dyes, to be approved by the FDA before they go on the market.  The FD&C Act does not require specific tests to ensure the safety of cosmetic ingredients or final products.  Also, the FD&C Act does not require cosmetic companies to share their safety information with the FDA.  Therefore, the manufacturers of cosmetics are solely and legally responsible for ensuring the safety of their products to the public and making sure they are properly labeled.

**C.     Hair Dyes**

71.     Hair dye usage is very common in the United States with 75% of women and 38% of men regularly coloring their hair every 6-8 weeks.  US hair dye sales total $2 billion dollars per year with world-wide sales of $12 billion dollars per year.   64% of people colored their hair black, 16% brown, and 20% preferred another color.  33% of people in the US preferred to have their hair colored in a salon.

72.     Hair dyes use chemicals to change hair color.  The three main types of hair dye are: permanent, semi-permanent, and temporary.  Permanent hair dyes cause lasting chemical changes in the hair shaft, and last until the hair is replaced by new growth. Permanent hair dyes make up about 80% of the market and use colorless dye intermediates and dye couplers.  When mixed with hydrogen peroxide the intermediates and couplers react with each other to form

pigment molecules. Darker colors are formed by using higher concentrations of intermediates. Semi-permanent hair dyes do not penetrate into the hair shaft, and typically last for about 10 washings. Temporary hair dyes cover the surface of the hair and do not penetrate into the hair shaft. They generally last for 1 to 2 washings.

73.    Hundreds of chemicals are used to make hair dyes, many are carcinogenic.

74.    People that are exposed to hair dyes frequently as part of their occupation such as hairdressers, cosmetologists, hair colorists, barbers, and salon workers have higher lifetime exposures to these carcinogenic chemicals than people who have their hair dyed in a salon or who dye it at home.

75.    In 2010, the International Agency for Research on Cancer (IARC) completed its comprehensive review and found that based on excessive risk of bladder cancer from occupational exposure to hair dyes the hairdressing occupation was listed as a Group 2A "probably carcinogenic to humans".

**D.    Studies on Bladder Cancer/Occupational Exposure**

76.    In the United States there are approximately 83,000 bladder cancer diagnoses per year, and approximately 16,000 deaths. Bladder cancer is the ninth most common cancer in the United States.

77.    Most bladder cancer tumors form after an individual is exposed to carcinogens that enter the body through inhalation, dermal contact, or ingestion. The two most frequent routes of exposure are through cigarette smoke and occupation. It is estimated that 5 percent of all bladder cancer diagnoses result from occupational exposure.

78.    In 1975, a peer-reviewed study published by Bruce Ames found that nearly 90% of commercially available hair dyes were mutagenic indicating a potential to cause DNA damage which could lead to cancer development. Safety concerns were raised in this study due to the presence of mutagenic hair dye intermediates called aromatic amines. In response to the Ames study, manufacturers supposedly changed the components in permanent hair dye products in an effort to eliminate carcinogenic chemicals. Manufacturers represented to the FDA and the public that now hair dyes were safe for use. Carcinogenic aromatic amines supposedly removed by

manufacturers at this time were 4-aminobiphenyl, o-toluidine, benzidine, and 2-naphthylamine, among many others.  However, studies conducted since the 1970s conclusively prove that manufactures failed to remove carcinogenic aromatic amines from its hair dye products.

79.     In 1994, a meta-analysis was conducted entitled *Epidemiological Evidence on Hair Dyes and the Risk of Cancer in Humans*.  This meta-analysis consisted of 7 cohort studies and 11 case control studies which included data on occupational exposure to hair dyes by hairdressers, barbers, and beauticians and their subsequent bladder cancer risk.  The study found that **"The association between past occupational exposure to hair colourants and bladder cancer risk is reasonably consistent on epidemiological data and plausible on biological grounds…the general evidence from case control studies is in agreement with that from cohort investigations, and is compatible with a moderately increased bladder cancer risk among hairdressers and barbers."**

80.     In 2001, a study entitled *Use of Permanent Hair Dyes and Bladder-Cancer Risk Case Control Study* was published by Gago-Dominguez among others.  The study found that individuals that used hair dye once per month more than doubled their risk for bladder cancer, and among those that used hair dyes for once a month for 15 or more years tripled their risk.  **The study further found that occupational exposures of hairdressers and barbers that were likely exposed to hair dyes for 10 or more years increased their risk of bladder cancer fivefold.**  The study concluded that long-term use of permanent hair dyes is a risk factor for bladder cancer and estimated 19% of bladder cancer diagnoses in women in Los Angeles County could be attributed to permanent hair dye usage.

81.     In 2003, the FDA published a peer-reviewed study entitled, *Identification of Aminobiphenyl Derivatives in Commercial Hair Dyes*.  **This study found up to 12.8 ppb of 4-Aminobiphyenyl (4-ABP), a known bladder carcinogen, in 8 out of 11 tested commercial hair dyes.**

82.     In 2008, a study entitled *A Meta-Analysis on the Association Between Bladder Cancer and Occupation,* was published.  The study found that hairdressers had a statistically significant 23% increased risk of bladder cancer, *(1.23 RR, 95%, CI 1.11-1.37)*.  The scientists

stated ***"Although the relative risk of bladder cancer associated with these occupations is small, the public health impact may be significant, considering the substantial number of people who were and are employed in these occupations."***

83.    In 2008, a study was published entitled *Elevated Bladder Cancer Risk Due to Colorants-A Statewide Case-Control Study in North Rhine-Westphalia, Germany*.  The study's questionnaire asked about occupation for more than 6 months and for exposures to several occupational and nonoccupational bladder carcinogens, and was limited to diagnoses of bladder cancer after 1988.  The study concluded that individuals exposed to hair colorants showed a nearly fivefold elevated bladder cancer risk (OR 4.9% for hairdressers).  The scientists stated, **"The results of this epidemiological study confirm the hypothesis that individuals exposed to colorants show an elevated bladder cancer risk."**

84.    In 2008 **a second study was published that found 4-ABP, and known bladder carcinogen, in hair dyes.  The study found 4-ABP in 28 of 54 commercial hair dyes.  In addition, this study found the presence of a second known bladder carcinogen, Ortho-Toluidine in 34 of 54 commercial hair dyes tested.**  *Determination of aromatic amines in hair dye and henna samples by ion-pair extraction and gas chromatography-mass spectrometry,* Akyuz (2008).

85.    In 2009, Harling and others published *Bladder Cancer Among Hairdressers: A Meta-Analysis.*  42 studies were included and this meta-analysis and statistically significant increased risks for bladder cancer were found for all but one analysis. The risk increased with duration of employment from 1.30 (95% CI 1.15 to 1.48) for 'ever registered as hairdressers' to 1.70 (95% CI 1.01 to 2.88) for 'job held greater than or equal to 10 years'.  The study concluded by stating **"The results of the present meta-analysis on 42 studies suggest that there is robust evidence for an increased risk of bladder cancer among hairdressers, in particular for hairdressers in a job held greater than or equal to 10 years . . . This corroborates the interpretation that there is a causal association between bladder cancer and job held as a hairdresser."**

86.    In 2014 **a third study was published that found known bladder carcinogens**

**present in hair dyes.** The study entitled *Exposure of Hairdressers to ortho-toluidine (known bladder carcinogen) and meta-toluidine in hair dyes*, included a questionnaire that asked if the subjects were currently employed as a hairdresser in last 4 months, other jobs/hobbies, lifestyle, treatments per week of permanent/semi hair dye, type of gloves used, frequency of glove use (90%), and frequency they changed gloves. Other occupational exposures were ruled out by asking about other jobs held within the past 6 months that would expose hairdressers to dyes. Blood samples were taken, and hemoglobin (Hb) adducts were analyzed for the presence of ortho-toluidine. **The study found that hairdressers using permanent hair dyes and waving products were exposed to ortho-toluidine and the amount of ortho- toluidine in blood increased with increasing number of weekly hair dye treatments**. The study also stated that the analyses of Hb adducts in exposed hairdressers is the best method for monitoring long-term exposure to aromatic amines because of the lifetime of Hb is about 4 months, and because of the close relationship with DNA adducts.

87.     The most recent global meta-analysis, published in 2015 in JAMA Oncology, looked at all types of occupations and risk for bladder cancer, and reported on those occupation classes that were associated with increased bladder cancer risk. (Cumberbatch et al. 2015) The authors conducted a systematic review search for studies through May 2014. Eligible studies focused primarily on bladder cancer and provided confidence intervals (or data for calculating them). There were 217 reports available and eligible for meta-analyses; of these, 42 (of 61) occupational classes showed elevated relative risks for bladder cancer incidence and 16 (of 40) occupational classes showed increased bladder cancer mortality risk. Reduced risk of bladder cancer incidence and mortality were reported for only 6 and 2 occupational classes, respectively. The number of studies that reported on hairdressing occupation was not given, but the data tables indicated that 47 "comparisons" were used in determining relative risk for bladder cancer with hairdressing occupation. The authors summarized data over the studies as Standard Incidence Ratios (SIR) or Standard Mortality Ratios (SMR). Overall, the risk for bladder cancer among hairdressers was increased by 32% (SIR 1.32, 95% CI 1.24-1.4). The risk for bladder cancer mortality increased by 16% (SIR 1.16, 95% CI 1.01-1.34). **The study also found that the risk**

---

**of bladder cancer was highest in occupations in which workers were exposed to aromatic amines (rubber, plastic, and dye workers, hairdressers, and painters).** The scientists listed the aromatic amines of 4-ABP and Ortho-Toluidine as "definitive bladder carcinogens", that the main carcinogen for hairdressers is 4-amino-biphenyl (4-ABP), and that historical reports showed that **16%-19% of workers exposed to 4-ABP contract bladder cancer**.

**E.    4-Aminobiphenyl and Ortho-Toluidine are Human Carcinogens**

88.    Chemical agents are classified according to their surety of cancer risk.  There are two institutions that identify, evaluate, and classify human carcinogens.  The first is the International Agency for the Research of Cancer (IARC).  The second is the National Toxicology Program (NTP).

89.    IARC is part of the World Health Organization (WHO) that conducts and coordinates research into causes of cancer.  It also collects and publishes surveillance data regarding the occurrence of cancer worldwide.  Its published "Monographs" identify carcinogenic hazards and evaluate environmental causes of cancer in humans.

90.    The National Toxicology Program (NTP) is program within the Department of Health and Human Services (DHHS) headquartered at the National Institute of Environmental Health Sciences (NIEHS) of the National Institutes of Health (NIH). NTP evaluates chemicals of concern for their potential to cause cancer in humans. As part of their cancer evaluation work, NTP publishes their Report on Carcinogens (RoC).  RoC is a document that identifies chemicals that may pose a carcinogenicity hazard to human health. The NTP RoC classifies chemicals as either "known to be a human carcinogen" or "reasonably anticipated to be a human carcinogen.

91.    IARC classified 4-Aminobiphenyl and Ortho-Toluidine as carcinogenic to humans (Group 1). IARC stated that both 4-ABP and O-T have been found in hair dyes.

92.    The NTP (RoC) classified 4-Aminobiphenyl and Ortho-Toluidine as "known to be a human carcinogen".   The NTP also stated that 4-ABP and O-T have been found in hair dyes.

**F.    Biological Mechanism of Action by 4-Aminobiphenyl and Ortho-Toluidine**

93.    4-ABP and o-toluidine have been found in DNA adducts of the bladder and mammary glands in exposed humans which are biological markers that allow for identification

of agents responsible for initiation of carcinogenic processes also reflecting exposure, biological effective dose, and local metabolic processes involved in formation of reactive species capable of binding to DNA and other macromolecules.   Gorlewska-Roberts (2002), *Carcinogen-DNA Adducts in Human Breast Epithelial Cells*.

94.    According to IARC and the NTP, 4-ABP causes cancer through a mechanism involving metabolic activation in the liver, where it is converted into a reactive N-hydroxy derivative which then forms DNA adducts, primarily by generating a highly reactive aryl nitrenium ion, ultimately leading to DNA damage and contributing to the development of bladder cancer, particularly in humans; this process is considered the primary mechanism of action for 4-ABP.  While the metabolism occurs primarily in the liver, the reactive metabolites are transported to the bladder, where they can readily bind to DNA due to the acidic urine environment, leading to bladder cancer development.

95.    According to IARC and NTP, ortho-toluidine's primary mechanism of action is through its metabolic activation to a highly reactive electrophilic metabolite, N-hydroxy-ortho-toluidine, which can directly bind to DNA, causing DNA adducts and ultimately leading to mutations that can contribute to bladder cancer development, particularly with prolonged exposure; this is considered the primary route of carcinogenicity associated with ortho-toluidine. The bladder is considered the primary target tissue for ortho-toluidine-induced cancer due to its high levels of metabolic enzymes and the ability of the urinary tract to concentrate the metabolite.

### III.    CLAIMS FOR RELIEF

### COUNT 1.  STRICT LIABILITY – FAILURE TO WARN

96.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

97.    On information and belief, Defendants manufactured, distributed, and sold the hair dye PRODUCTS that Decedent used and/or was exposed to at an early age.

98.    On information and belief, the PRODUCTS had potential risk and side effects that were known or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of their manufacture, distribution and sale.

99.     On information and belief, the potential risks and side effects presented a substantial danger when the PRODUCTS were used or misused in an intended or reasonably foreseeable way.

100.    On information and belief, ordinary consumers would not have recognized the potential risks and side effects described herein.

101.    On information and belief, Defendants failed to adequately warn or instruct of the potential risks and side effects as evidenced through the following conduct:

 a. Omitting warnings on product labels or from other marketing materials the warning that use of and/or exposure to the PRODUCTS could lead to an increased risk of bladder cancer.

 b. Representing on the labeling and in their marketing materials that Defendants PRODUCT is safe for use as directed.

 c. Failing to inform its customers and end users of the PRODUCTS, including Plaintiff, of a known catastrophic health hazard associated with their use.

 d. Procuring and disseminating false, misleading, and biased information regarding the safety of its PRODUCTS to the public and using influence over governmental and regulatory bodies regarding their PRODUCTS.

102.    As a result of Defendants' failure to warn, Decedent was exposed to and used the PRODUCTS and was gravely harmed by her exposure and use of said PRODUCTS as described herein.

103.    On information and belief, as a proximate result of the conduct, acts, and omissions alleged herein, Plaintiff incurred medical expenses which survive the death of the Decedent. Prior to her death, Decedent suffered special damages, medical expenses, severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, and death. Plaintiff has suffered loss of care, comfort, and economic damages and other general damages as the result of the wrongful death of Decedent BEVERLY WHITE.

## COUNT 2.  STRICT LIABILITY – DESIGN DEFECT – RISK-UTILITY TEST

104.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth

herein.

105.    On information and belief, at all relevant times alleged herein, the PRODUCTS were designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to be tested, inspected or failed to be inspected, labeled, advertised, promoted, marketed, supplied, distributed, licensed, wholesaled, and sold by Defendants in the regular course of business.

106.    On information and belief, at all relevant times alleged herein, the PRODUCTS manufactured, supplied, licensed and/or placed into the stream of commerce by Defendants herein were defective and unreasonably dangerous in that:

     a.  the utility of the PRODUCTS does not outweigh the danger of developing bladder cancer when the PRODUCTS are used as intended;

     b.  the PRODUCTS are not reasonably fit, suitable or safe for their intended purpose and the foreseeable risks far exceeded the benefits associated with the design or formulation;

     c.  the PRODUCTS contained inadequate warnings or instructions; and,

     d.  the PRODUCTS contained dangerous ingredients while feasible safer alternative designs and ingredients were available.

107.    Plaintiff is informed and believes that, at all relevant times alleged herein, Defendants knew that the PRODUCTS were to be purchased and used without inspection for defects.

108.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the PRODUCTS were and are unsafe for their intended use by reason of defects in the design so that they would not safely serve their purpose, but would instead expose the users of said PRODUCTS to serious injuries.

109.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, there were practical and feasible alternative designs and formulations that would have prevented and/or significantly reduced the risk of Decedent's injuries and death, without impairing the reasonable anticipated or intended function of the PRODUCTS.  These

safer alternative designs and/or formulations were economically and technologically feasible, and would have prevented and/or significantly reduced the risk of Decedent's injuries and death without substantially impairing utility.

110.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the PRODUCTS were substantially in the same condition as when they left the possession of Defendants.

111.    At all pertinent times, Decedent was exposed to and/or used the PRODUCTS in the manner that was intended which were a reasonably foreseeable and normally intended uses by Defendants, as said Defendants gave no warnings in opposition, but rather, promoted the use of the PRODUCTS.

112.    At all relevant times alleged herein, the design and/or formulation of the PRODUCTS was a substantial factor in causing harm and death to Decedent.

113.    As a legal and proximate result of the aforementioned defects in the design and/or formulation of the PRODUCTS, Decedent sustained the injuries and damages as alleged herein.

114.    On information and belief, as a proximate result of the conduct, acts, and omissions alleged herein, Plaintiff has incurred medical expenses which survive Decedent, Plaintiff has suffered and will suffer other special damages, and other general damages.

<u>**COUNT 3.  STRICT LIABILITY – DESIGN DEFECT –**</u>

<u>**CONSUMER EXPECTATIONS TEST**</u>

115.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

116.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants are the manufacturers, distributors, and suppliers of the PRODUCTS, which are within the ordinary experience and understanding of a consumer.  A consumer may reasonably believe that said PRODUCTS are designed to be and may be applied to the body without causing significant harm.

117.    California law allows a design defect claim to be proved either consumer expectations test or the risk utility test.  As stated by the California Supreme Court: "Notably,

the Third Restatement rejects the consumer expectations test for proving design defect liability. (See Rest.3d Torts, Products Liability, §2, com. g, pp. 27-28.)  This position is contrary to California law, which allows a design defect to be shown by either the consumer expectations or the risk utility test.  (See ante, 202 Cal.Rptr3fd at p. 469, 370 P.3d at p. 1033; *Barker, supra,* 20 Cal.3d at p. 432, 143 Cal.Rptr. 225, 573 P.2d 443.)  The present case concerns only failure to warn, and we express no view on design defect liability." *Webb v. Special Elec. Co., Inc.* (2016) 63 Cal.4th 167, 184 fn 8.

118.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the PRODUCTS were defective in design or formulation in that, they did not perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way, and they were unreasonably dangerous, and more dangerous than an ordinary consumer would expect.

119.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, said PRODUCTS were inherently dangerous and harmful for their intended use, contrary to ordinary consumer expectations.

120.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, as a result of the defective condition of the PRODUCTS, Decedent suffered injuries, damages, and death as herein alleged, and the failure of the PRODUCTS to perform safely was a substantial factor in causing Decedent's harm.

121.    On information and belief, as a proximate result of the conduct, acts, and omissions alleged herein, Plaintiff has incurred medical expenses which survive the Decedent, Plaintiff has suffered and will suffer other special damages, Plaintiff has suffered and will suffer conscious pain and suffering and other general damages.

122.    On information and belief, at all relevant times alleged herein, Decedent's injuries occurred while the PRODUCTS were being used in an intended and reasonably foreseeable manner, and Defendants were aware of and intended that the PRODUCTS would be used in the manner in which the materials were actually used.

## COUNT 4.  NEGLIGENT FAILURE TO WARN

123.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

124.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants were negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing the PRODUCTS in one or more of the following respects:

    a.   failing to warn Decedent of the hazards associated with the use of the PRODUCTS;

    b.   failing to properly test their PRODUCTS to determine adequacy and effectiveness or safety measures, if any, prior to releasing the PRODUCTS for consumer use;

    c.   failing to properly test their PRODUCTS to determine the increased risk of bladder cancer during the normal and/or intended use of the PRODUCTS;

    d.   failing to inform ultimate users, such as Plaintiff, as to the safe and proper methods of handling and using the PRODUCTS;

    e.   failing to remove the PRODUCTS from the market when the Defendants knew or should have known the PRODUCTS were defective;

    f.   failing to instruct the ultimate users, such as Decedent, as to the methods for reducing the type of exposure to the PRODUCTS which caused increased risk of bladder cancer;

    g.   failing to inform the public in general and the Decedent in particular of the known dangers using the PRODUCTS;

    h.   failing to advise users how to prevent or reduce exposure that caused increased risk of bladder cancer;

    i.   marketing and labeling the PRODUCTS as safe for all uses despite knowledge to the contrary; and,

    j.   failing to act as a reasonably prudent company under similar circumstances.

125.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants knew, or reasonably should have known, that users, including

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL                    PAGE 28 OF 42

Decedent, would not realize the dangers of using the PRODUCTS, and a reasonable manufacturer, distributor and/or seller under the same or similar circumstances would have warned of the dangers or instructed on the safe use of the PRODUCTS.

126.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, each and all of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries, damages, and death sustained by Decedent.

127.     On information and belief, at all relevant times alleged herein, Defendants knew or should have known that the PRODUCTS were unreasonably dangerous and defective when used or misused in a reasonably foreseeable manner.

128.     On information and belief, as a direct and proximate result of the Defendants' negligence in one or more of the aforementioned ways, Decedent purchased and used, as aforesaid, the PRODUCTS that directly and proximately were a substantial factor in causing Decedent to develop bladder cancer.

129.     On information and belief, as a proximate result of the conduct, acts, and omissions alleged herein, Plaintiff has incurred medical expenses which survive the Decedent, Plaintiff has suffered and will suffer other special damages, and other general damages.

## COUNT 5.  DECEIT BY CONCEALMENT

130.      Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

131.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants from the time that the PRODUCTS were first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, willfully deceived the Decedent and the public in general, by concealing from the, the true facts concerning the PRODUCTS, which the said Defendants had a duty to disclose.

132.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants conducted a sales and marketing campaign to promote the sale of the PRODUCTS and willfully deceived the Decedent, and the public in general as to the health risks and consequences of the use of the PRODUCTS, which included but not limited to, the

following false, deceptive, misleading, and untruthful advertisements, public statements, marketing campaigns, and promotions:

    a.   failing to disclose or warn Decedent of the hazards associated with the use of the PRODUCTS;

    b.   failing to properly test their PRODUCTS to determine adequacy and effectiveness or safety measures, if any, prior to releasing the PRODUCTS for consumer use;

    c.   failing to properly test their PRODUCTS to determine the increased risk of bladder cancer during the normal and/or intended use of the PRODUCTS;

    d.   failing to inform ultimate users, such as Decedent, as to the safe and proper methods of handling and using the PRODUCTS;

    e.   failing to remove the PRODUCTS from the market when the Defendants knew or should have known the PRODUCTS were defective;

    f.   failing to instruct the ultimate users, such as Decedent, as to the methods for reducing the type of exposure to the PRODUCTS which caused increased risk of bladder cancer;

    g.   failing to disclose to the public in general and the Decedent in particular the known dangers of using the PRODUCTS;

    h.   failing to advise users how to prevent or reduce exposure that caused increased risk for bladder cancer;

    i.   marketing and labelling the PRODUCTS as safe for all uses despite knowledge to the contrary; and,

    j.   failing to act like a reasonably prudent company under similar circumstances.

133.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants were aware of the foregoing, and that the PRODUCTS were not safe, fit, and effective for use as intended.  Furthermore, said Defendants were aware that the use of the PRODUCTS was hazardous to health, and that the PRODUCTS carry a significant propensity to cause serious injuries to users including, but not limited to, the injuries suffered by Decedent as alleged herein.

134.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, that Defendants intentionally concealed and suppressed the true facts concerning the PRODUCTS with the intent to defraud the Decedent, other consumers, and the public in general, in that said Defendants knew that Decedent would not have used the PRODUCTS if she had known the true facts concerning the risks and dangers of the PRODUCTS.

135.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, that as a result of the foregoing fraudulent and deceitful conduct by Defendants, Decedent suffered injuries, damages, and death as alleged herein.

136.    On information and belief, as a proximate result of the conduct, acts, and omissions alleged herein, Plaintiff has incurred medical expenses which survive the Decedent, Plaintiff has suffered and will suffer other special damages, Plaintiff has suffered and will suffer conscious pain and suffering and other general damages.

## COUNT 6.  VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

137.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

138.    This Count 6 is a cause of action for the violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.

139.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants from the time that the PRODUCTS were first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, willfully deceived the Decedent and the public in general, by concealing from the, the true facts concerning the PRODUCTS, which the said Defendants had a duty to disclose.

140.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants conducted a sales and marketing campaign to promote the sale of the PRODUCTS and willfully deceived the Decedent, and the public in general as to the health risks and consequences of the use of the PRODUCTS, which included but not limited to, the following false, deceptive, misleading, and untruthful advertisements, public statements, marketing campaigns, and promotions:

a.   failing to disclose or warn Decedent of the hazards associated with the use of the PRODUCTS;

b.   failing to properly test their PRODUCTS to determine adequacy and effectiveness or safety measures, if any, prior to releasing the PRODUCTS for consumer use;

c.   failing to properly test their PRODUCTS to determine the increased risk of bladder cancer during the normal and/or intended use of the PRODUCTS;

d.   failing to inform ultimate users, such as Decedent, as to the safe and proper methods of handling and using the PRODUCTS;

e.   failing to remove the PRODUCTS from the market when the Defendants knew or should have known the PRODUCTS were defective;

f.   failing to instruct the ultimate users, such as Decedent, as to the methods for reducing the type of exposure to the PRODUCTS which caused increased risk of bladder cancer;

g.   failing to disclose to the public in general and the Decedent in particular the known dangers of using the PRODUCTS;

h.   failing to advise users how to prevent or reduce exposure that caused increased risk for bladder cancer;

i.   marketing and labelling the PRODUCTS as safe for all uses despite knowledge to the contrary; and,

j.   failing to act like a reasonably prudent company under similar circumstances.

141.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants were aware of the foregoing, and that the PRODUCTS were not safe, fit, and effective for use as intended.  Furthermore, said Defendants were aware that the use of the PRODUCTS was hazardous to health, and that the PRODUCTS carry a significant propensity to cause serious injuries to users including, but not limited to, the injuries suffered by Decedent as alleged herein.

142.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, that Defendants intentionally concealed and suppressed the true facts

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL                 PAGE 32 OF 42

concerning the PRODUCTS with the intent to defraud the Decedent, other consumers, and the public in general, in that said Defendants knew that Decedent would not have used the PRODUCTS if he had known the true facts concerning the risks and dangers of the PRODUCTS.

143. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, that as a result of the foregoing fraudulent and deceitful conduct by Defendants, Decedent suffered injuries, damages, and death as alleged herein

144. The foregoing fraudulent and deceitful conduct by Defendants amounts to unlawful, unfair, and fraudulent practices in violation of the UCL.

145. Defendants' acts, omissions, and practices described above constitute "unfair" practices because they are contrary to California's legislatively declared policy condemning deceptive advertising and marketing of goods and services. Defendants falsely represented the nature, quality, condition, ingredients, health hazards, and dangers posed by the PRODUCTS.

146. Defendants' conduct constitutes unfair methods of competition and business practices.

147. Defendant's acts, omissions, and practices described above are contrary to California public policy and constitute immoral, unethical, and unscrupulous practices that caused substantial injury to the Decedent.

148. All of Defendants' unlawful and unfair conduct, failures to disclose, and fraudulent practices and misrepresentations alleged herein occurred in the course of Defendants' respective businesses and were part of a generalized course of conduct.

149. Defendants' unlawful, unfair, and fraudulent conduct alleged herein was designed to and did induce Decedent to purchase the PRODUCTS.

150. Decedent would not have purchased the PRODUCTS but for Defendants' unlawful, unfair, and fraudulent business conduct.

151. As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business conduct, Decedent suffered concrete and particularized injuries, including monetary loss in the form of paying for the PRODUCTS.

152. Plaintiff is entitled to appropriate relief, including restitution, declaratory relief,

and a permanent injunction prohibiting Defendants from engaging in the aforementioned practices that violate the UCL. Plaintiff further seeks reasonable attorneys' fees and costs under applicable law including California Code of Civil Procedure 1021.5.

## COUNT 7.  WRONGFUL DEATH

153.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

154.    Plaintiff is the surviving heir of Decedent, as identified above, who used the PRODUCTS and was injured and died as a result. Said Decedent purchased, was supplied with, received, applied, used and consumed said PRODUCTS as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, sold or otherwise placed in the stream of interstate commerce by Defendants, which contained the carcinogenic aromatic amines as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, sold or otherwise placed in the stream of interstate commerce by Defendants.

155.    The injuries and damages of Decedent were caused by the wrongful acts, omissions, and fraudulent misrepresentations of Defendants.

156.    As a result of the conduct of Defendants and the Decedent's use of the PRODUCTS, the Decedent suffered fatal injuries.

157.    As a result of the death of the Decedent, Plaintiff has been deprived of love, companionship, comfort, support, affection, society, solace and moral support of the Decedent.

158.    Plaintiff is entitled to recover economic and non-economic damages against all Defendants for wrongful death directly and legally caused by the defects in Defendants' PRODUCTS and the negligent conduct, acts, errors, omissions and intentional and negligent misrepresentations of Defendants, and each of them.

## COUNT 8.  SURVIVAL ACTION

159.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth

herein.

160.   Decedent incurred special damages in the form of the reasonable value of services rendered for medical care for the injuries that Decedent sustained prior to death, all caused by Decedent's exposure to the PRODUCTS. Plaintiff is the personal representative or successor-in-interest and authorized to bring this survival action on behalf of the Decedent pursuant to California Code of Civil Procedure § 377.31, *et seq*.

161.   Plaintiff incurred special damages for losses sustained by Decedent in for the form of the reasonable value of services rendered for medical care for the injuries sustained by the Decedent prior to death, lost earnings and other special damages.

162.   As a direct and proximate result of the defects in the PRODUCTS and the conduct of Defendants, Plaintiff and Decedent sustained the damages as set forth above.

## TOLLING STATUTES OF LIMITATIONS AND PUNITIVE DAMAGES

163.   Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

164.   Plaintiff suffered illnesses that have latency periods and do not arise until many years after exposure.  Plaintiff's illnesses did not distinctly manifest as having been caused by the PRODUCTS until Plaintiff was made aware that the bladder cancer could be caused by use of and exposure to the PRODUCTS.  Consequently, the discovery rule applies to this case and the statute of limitations has been tolled until the day that Plaintiff knew or had reason to know that bladder cancer was linked to the use of and exposure to the PRODUCTS.

165.   Furthermore, the running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct.   Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with the chemicals contained within the PRODUCTS.

166.   As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know, or could not have reasonably learned through reasonable diligence, that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

167.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth, quality and nature of the PRODUCTS.  Defendants were under a duty to disclose the true character, quality and nature of PRODUCTS because this was non-public information which the Defendants had and continue to have in their exclusive control, and because the Defendants knew that this information was not available to Plaintiff.

168.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting profitable PRODUCTS, notwithstanding the known or reasonably known risks.  Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on Defendants' representations.

169.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, in representations to the Plaintiff and the public in general, Defendants also fraudulently concealed and intentionally omitted the following material information:

a.    that the PRODUCTS were not as safe as other products available;

b.    that the PRODUCTS were dangerous; and,

c.    that the PRODUCTS were defectively and negligently designed and had defective, inadequate, and insufficient warnings and instructions.

170.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants were under a duty to disclose to Plaintiff, and the public in general, the defective nature of the PRODUCTS.

171.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants made the misrepresentations and actively concealed information concerning the safety and efficacy of the PRODUCTS with the intention and specific desire to induce the consumers, including the Plaintiff, to rely on such misrepresentations in selecting, purchasing and using the PRODUCTS.

172.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants made these misrepresentations and actively concealed

information concerning the safety and efficacy of the PRODUCTS in the labeling, advertising, promotional material or other marketing efforts.

173.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, these representations, and others made by Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

174.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the misrepresentations and active concealments by Defendants were perpetuated directly and indirectly by Defendants, their sales representative, employees, distributors, agents, marketers and detail persons.

175.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the representations were made, Plaintiff did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the PRODUCTS.  Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff discover the false representations of Defendants, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendants' misrepresentations.

176.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants knew that Plaintiff, and the public in general, had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the PRODUCTS, as set forth herein.

177.   Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the PRODUCTS, Plaintiff would not have purchased, used, been exposed to, or relied on Defendants' PRODUCTS.

178.   Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, including Plaintiff.

179.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the information distributed to the public and Plaintiff by Defendants included, but was not limited to, reports, press releases, advertising campaigns, television

commercials, print advertisements, billboards, and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the PRODUCTS.

180.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants intentionally made material misrepresentations to the medical community and public, including Plaintiff, regarding the safety of the PRODUCTS, specifically that the PRODUCTS did not have dangerous and/or serious adverse health safety concerns, and that the PRODUCTS were as safe as other products.

181.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants' intent and purpose in making these misrepresentations was to deceive the Plaintiff; to gain the confidence of the public, the medical community, and Plaintiff, to falsely assure them of the quality and fitness for use of the PRODUCTS; and induce Plaintiff and the public to use the PRODUCTS.

182.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the PRODUCTS to the public at large, for the purpose of influencing the sales of PRODUCTS known to be dangerous and defective, and/or not as safe as other alternatives.

183.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, at all times relevant to this action, Defendants knew that the PRODUCTS were not safe for consumers.

184.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the misrepresentations and active concealment by Defendants constitute a continuing tort.  Indeed, Defendants continue to misrepresent the potential risks and serious side effects associated with the use of the PRODUCTS.

185.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, as a result of the Defendants' advertising and marketing efforts, and representations, the PRODUCTS are and continue to be pervasively manufactured and used in

California and throughout the United States.

186.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the acts, conduct, and omission of Defendants, and each of them, as alleged throughout this Complaint were fraudulent, willful and malicious and were done with a conscious disregard for the rights of the Plaintiff and other users of the PRODUCTS and for the primary purpose of increasing Defendants' profits from the sale and distribution of the PRODUCTS. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against each Defendant in an amount appropriate to punish and make an example of each Defendant.

187.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, prior to the manufacturing, sale and distribution of the PRODUCTS, Defendants, and each of them, knew that the PRODUCTS were in a defective condition as previously alleged herein and knew that those who used the PRODUCTS would experience and did experience severe injuries.  Further, Defendants and each of them through their officers, directors, managers, and agents, had knowledge that the PRODUCTS presented a substantial and unreasonable risk of harm to the public, including Plaintiff and, as such, consumers of the PRODUCTS were unreasonably subjected to risk of injury.

188.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, despite such knowledge, Defendants, and each of them, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in the PRODUCTS and failed to warn the public, including the Plaintiff, of the extreme risk of injury occasioned by said defects inherent in the PRODUCTS.  Defendants and their individual agents, officers, and directors, intentionally proceeded with the manufacturing, sale, distribution and marketing of the PRODUCTS knowing that the public, including Plaintiff, would be exposed to serious danger in order to advance Defendants' own pecuniary interest and monetary profits.

189.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants' conduct was despicable, and so contemptible that it would be

looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for safety, entitling Plaintiffs to exemplary damages under California Civil Code §3294.

190.    Plaintiff filed this lawsuit within the applicable limitations period of first suspecting that the PRODUCTS were the cause of any appreciable harm sustained by Plaintiff, within the applicable limitations period of first suspecting or having reason to suspect any wrongdoing, and within the applicable limitations period of first discovering the injuries.  Plaintiff could not, by the exercise of reasonable diligence, have discovered any wrongdoing and could not have discovered the causes of the injuries at an earlier time because the injuries occurred without initial perceptible trauma or harm and, when the injuries were discovered, the causes were not immediately known.  Plaintiff did not suspect, nor did he have reason to suspect, that wrongdoing had caused the injuries until recently.  Plaintiff filed the original action within two years of discovering the causes of action and identities of Defendants.

191.    Plaintiff had no knowledge of the defects in the PRODUCTS or of the wrongful conduct of Defendants as set forth herein, nor did Plaintiff have access to information regarding other injuries and complaints in the possession of Defendants.  Additionally, Plaintiff was prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public that the PRODUCTS are safe and free from defects, and Defendants fraudulently concealed information to allow Plaintiff to discover a potential cause of action sooner.

192.    Plaintiff has reviewed his potential legal claims and causes of action against the Defendants and intentionally chooses only to pursue claims based on state-law.  Any reference to any federal agency, regulation or rule is stated solely as background information and does not raise a federal question.  Plaintiff chooses to only pursue claims based on state law and is not making any claims that raise federal questions.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for judgment against Defendants jointly and severally, and as appropriate to each cause of action alleged and the standing of Plaintiff as follows:

a. Past and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial;

b. Past and future economic and special damages according to proof at the time of trial;

c. Past and future medical expenses according to proof at the time of trial;

d. Past and future pain and suffering damages expenses according to proof at the time of trial;

e. Punitive or exemplary damages according to proof at the time of trial;

f. Damages recoverable for the wrongful death of BEVERLY WHITE;

g. Attorney's fees;

h. For costs of suit incurred herein;

i. For prejudgment interest as provided by law; and,

j. For such other and further relief as the Court may deem just and proper.

Dated: April 23, 2025

/s/ *Andrew Parker Felix*
ANDREW PARKER FELIX (SBN 276002)
Email: andrew@forthepeople.com
MORGAN & MORGAN, P.A.
633 West Fifth Street, Suite 2200
Los Angeles, CA 90071
Telephone: (407) 244-3209
Fax: (407) 245-3334

R. Allen Smith, Jr. (*pro hac vice forthcoming*)
THE SMITH LAW FIRM, PLLC
300 Concourse Blvd., Suite 104
Ridgeland, MS 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426
Email: asmith@smith-law.org
*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all counts in this Complaint.

Dated: April 23, 2025

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL                    PAGE 41 OF 42

/s/ *Andrew Parker Felix*
ANDREW PARKER FELIX (SBN 276002)
Email: andrew@forthepeople.com
MORGAN & MORGAN, P.A.
633 West Fifth Street, Suite 2200
Los Angeles, CA 90071
Telephone: (407) 244-3209
Fax: (407) 245-3334


R. Allen Smith, Jr. (*pro hac vice forthcoming*)
THE SMITH LAW FIRM, PLLC
300 Concourse Blvd., Suite 104
Ridgeland, MS  39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426
Email: asmith@smith-law.org
*Attorneys for Plaintiffs*

# EXHIBIT B

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Andrew Parker Felix (SBN 276002) MORGAN & MORGAN, P.A. 633 West Fifth Street, Suite 2200, Los Angeles, CA 90071 | **Electronically FILED by Superior Court of California, County of Los Angeles 4/25/2025 10:49 AM David W. Slayton, Executive Officer/Clerk of Court, By G. Cordon, Deputy Clerk** |

TELEPHONE NO.: (407) 244-3209          FAX NO. : (407) 245-3334
EMAIL ADDRESS: andrew@forthepeople.com
ATTORNEY FOR *(Name):* HOLLY WHITE

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  LOS ANGELES
STREET ADDRESS: 312 North Spring Street
MAILING ADDRESS: 312 North Spring Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Spring Street Courthouse

CASE NAME:
WHITE v. L'OREAL USA, INC., ET AL.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 25STCV12023 |
|---|---|---|
| [X] Unlimited (Amount demanded exceeds $35,000) | [ ] Limited (Amount demanded is $35,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[X] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [X] is  [ ] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [X] Large number of witnesses
   e. [X] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [X] punitive
4. Number of causes of action *(specify):* 6 - (3) Strict Liability, Negligent Failure to Warn, Deceit by Concealment, Violations of UCL
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: April 25, 2025
ANDREW PARKER FELIX
_____          ►          _____
(TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California          **CIVIL CASE COVER SHEET**          Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**                                      CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
    Uninsured Motorist (46) *(if the*
    *case involves an uninsured*
    *motorist claim subject to*
    *arbitration, check this item*
    *instead of Auto)*
**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death) Tort**
    Asbestos (04)
        Asbestos Property Damage
        Asbestos Personal Injury/
            Wrongful Death
    Product Liability *(not asbestos or*
        *toxic/environmental)* (24)
    Medical Malpractice (45)
        Medical Malpractice–
            Physicians & Surgeons
        Other Professional Health Care
            Malpractice
    Other PI/PD/WD (23)
        Premises Liability (e.g., slip
            and fall)
        Intentional Bodily Injury/PD/WD
            (e.g., assault, vandalism)
        Intentional Infliction of
            Emotional Distress
        Negligent Infliction of
            Emotional Distress
        Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
    Business Tort/Unfair Business
        Practice (07)
    Civil Rights (e.g., discrimination,
        false arrest) *(not civil*
        *harassment)* (08)
    Defamation (e.g., slander, libel) (13)
    Fraud (16)
    Intellectual Property (19)
    Professional Negligence (25)
        Legal Malpractice
        Other Professional Malpractice
            *(not medical or legal)*
    Other Non-PI/PD/WD Tort (35)
**Employment**
    Wrongful Termination (36)
    Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease
        Contract *(not unlawful detainer*
            *or wrongful eviction)*
    Contract/Warranty Breach–Seller
        Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
        Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally*
    *complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
    Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent*
        *domain, landlord/tenant, or*
        *foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal*
    *drugs, check this item; otherwise,*
    *report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
        Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner
        Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
    Antitrust/Trade Regulation (03)
    Construction Defect (10)
    Claims Involving Mass Tort (40)
    Securities Litigation (28)
    Environmental/Toxic Tort (30)
    Insurance Coverage Claims
        *(arising from provisionally complex*
        *case type listed above)* (41)
**Enforcement of Judgment**
    Enforcement of Judgment (20)
        Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic*
        *relations)*
    Sister State Judgment
    Administrative Agency Award
        *(not unpaid taxes)*
    Petition/Certification of Entry of
        Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
    RICO (27)
    Other Complaint *(not specified above)* (42)
        Declaratory Relief Only
        Injunctive Relief Only *(non-*
            *harassment)*
        Mechanics Lien
        Other Commercial Complaint
            Case *(non-tort/non-complex)*
        Other Civil Complaint
            *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
    Partnership and Corporate
        Governance (21)
    Other Petition *(not specified above)* (43)
        Civil Harassment
        Workplace Violence
        Elder/Dependent Adult Abuse
        Election Contest
        Petition for Name Change
        Petition for Relief From Late Claim
        Other Civil Petition

CM-010 [Rev. January 1, 2024]                 **CIVIL CASE COVER SHEET**                 Page 2 of 2

| SHORT TITLE | CASE NUMBER |
|---|---|
| WHITE v. L'OREAL USA, INC., ET AL. | 25STCV12023 |

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

| This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court |
|---|

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1.  Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7.  Location where petitioner resides. |
| 2.  Permissive filing in Central District. | 8.  Location wherein defendant/respondent functions wholly. |
| 3.  Location where cause of action arose. | 9.  Location where one or more of the parties reside. |
| 4.  Location where bodily injury, death or damage occurred. | 10.  Location of Labor Commissioner Office. |
| 5.  Location where performance required, or defendant resides. | 11.  Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6.  Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| WHITE v. L'OREAL USA, INC., ET AL. | 25STCV12023 |

| | A<br>Civil Case Cover<br>Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable<br>Reasons (see<br>Step 3 above) |
|---|---|---|---|
| **Other Personal Injury/ Property Damage/ Wrongful Death** | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | Product Liability (24) | ☑ 2401 Product Liability (not asbestos or toxic/ environmental) | 1,④ |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| WHITE v. L'OREAL USA, INC., ET AL. | 25STCV12023 |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br>Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| WHITE v. L'OREAL USA, INC., ET AL. | 25STCV12023 |

| | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation (Continued)** | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| WHITE v. L'OREAL USA, INC., ET AL. | 25STCV12023 |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON: | ADDRESS: |
|---|---|
| ☐ 1. ☐ 2. ☐ 3. ☑ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | Spring Street Courthouse<br>312 N Spring Street<br>Los Angeles, CA 90012 |

| CITY: | STATE: | ZIP CODE: | |
|---|---|---|---|
| Los Angeles | CA | 90012 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the  Central Judicial  District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated:  04/25/2025 

_____

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (01/23).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

# EXHIBIT C



*Superior Court of California, County of Los Angeles*
## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS MUST SERVE THIS ADR INFORMATION PACKAGE ON ANY NEW PARTIES NAMED TO THE ACTION WITH THE CROSS-COMPLAINT.**

**WHAT IS ADR?**

Alternative Dispute Resolution (ADR) helps people find solutions to their legal disputes without going to trial. The Court offers a variety of ADR resources and programs for various case types.

**TYPES OF ADR**

- **Negotiation.** Parties may talk with each other about resolving their case at any time. If the parties have attorneys, they will negotiate for their clients.

- **Mediation.** Mediation may be appropriate for parties who want to work out a solution but need help from a neutral third party. A mediator can help the parties reach a mutually acceptable resolution. Mediation may be appropriate when the parties have communication problems and/or strong emotions that interfere with resolution. Mediation may not be appropriate when the parties want a public trial, lack equal bargaining power, or have a history of physical or emotional abuse.

- **Arbitration.** Less formal than a trial, parties present evidence and arguments to an arbitrator who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision.

- **Settlement Conferences.** A judge or qualified settlement officer assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Mandatory settlement conferences may be ordered by a judicial officer. In some cases, voluntary settlement conferences may be requested by the parties.

**ADVANTAGES OF ADR**

- **Save time and money.** Utilizing ADR methods is often faster than going to trial and parties can save on court costs, attorney's fees, and other charges.
- **Reduce stress and protect privacy.** ADR is conducted outside of a courtroom setting and does not involve a public trial.
- **Help parties maintain control.** For many types of ADR, parties may choose their ADR process and provider.

**DISADVANTAGES OF ADR**

- **Costs.** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial.** ADR does not provide a public trial or decision by a judge or jury.

**WEBSITE RESOURCES FOR ADR**

- **Los Angeles Superior Court ADR website:** www.lacourt.org/ADR
- **California Courts ADR website:** www.courts.ca.gov/programs-adr.htm

**Los Angeles Superior Court ADR Programs for Unlimited Civil (cases valued over $35,000)**

Litigants should closely review the requirements for each program and the types of cases served.

- **Civil Mediation Vendor Resource List.** Litigants in unlimited civil cases may use the Civil Mediation Vendor Resource List to arrange voluntary mediations without Court referral or involvement. The Resource List includes organizations that have been selected through a formal process that have agreed to provide a limited number of low-cost or no-cost mediation sessions with attorney mediators or retired judges. Organizations may accept or decline cases at their discretion. Mediations are scheduled directly with these organizations and are most often conducted through videoconferencing. The organizations on the Resource List target active civil cases valued between $50,000-$250,000, though cases outside this range may be considered. *For more information and to view the list of vendors and their contact information, download the Resource List Flyer and FAQ Sheet at www.lacourt.org/ADR/programs.html.*

  **RESOURCE LIST DISCLAIMER:** The Court provides this list as a public service. The Court does not endorse, recommend, or make any warranty as to the qualifications or competency of any provider on this list. Inclusion on this list is based on the representations of the provider. The Court assumes no responsibility or liability of any kind for any act or omission of any provider on this list.

- **Mediation Volunteer Panel (MVP).** Unlimited civil cases referred by judicial officers to the Court's Mediation Volunteer Panel (MVP) are eligible for three hours of virtual mediation at no cost with a qualified mediator from the MVP. Through this program, mediators volunteer preparation time and three hours of mediation at no charge. If the parties agree to continue the mediation after three hours, the mediator may charge their market hourly rate. When a case is referred to the MVP, the Court's ADR Office will provide information and instructions to the parties. The Notice directs parties to meet and confer to select a mediator from the MVP or they may request that the ADR Office assign them a mediator. The assigned MVP mediator will coordinate the mediation with the parties. *For more information or to view MVP mediator profiles, visit the Court's ADR webpage at www.lacourt.org/ADR or email ADRCivil@lacourt.org.*

- **Mediation Center of Los Angeles (MCLA) Referral Program.** The Court may refer unlimited civil cases to mediation through a formal contract with the Mediation Center of Los Angeles (MCLA), a nonprofit organization that manages a panel of highly qualified mediators. Cases must be referred by a judicial officer or the Court's ADR Office. The Court's ADR Office will provide the parties with information for submitting the case intake form for this program. MCLA will assign a mediator based on the type of case presented and the availability of the mediator to complete the mediation in an appropriate time frame. MCLA has a designated fee schedule for this program. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

- **Resolve Law LA (RLLA) Virtual Mandatory Settlement Conferences (MSC).** Resolve Law LA provides three-hour virtual Mandatory Settlement Conferences at no cost for personal injury and non-complex employment cases. Cases must be ordered into the program by a judge pursuant to applicable Standing Orders issued by the Court and must complete the program's online registration process. The program leverages the talent of attorney mediators with at least 10 years of litigation experience who volunteer as settlement officers. Each MSC includes two settlement officers, one each from the plaintiff and defense bars. Resolve Law LA is a joint effort of the Court, Consumer Attorneys Association of Los Angeles County (CAALA), Association of Southern California Defense Counsel (ASCDC), Los Angeles Chapter of the American Board of Trial Advocates (LA-ABOTA), Beverly Hills Bar Foundation (BHBF), California Employment Lawyers Association (CELA), and Los Angeles County Bar Association (LACBA). *For more information, visit https://resolvelawla.com.*

- **Judicial Mandatory Settlement Conferences (MSCs).** Judicial MSCs are ordered by the Court for unlimited civil cases and may be held close to the trial date or on the day of trial. The parties and their attorneys meet with a judicial officer who does not make a decision, but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For more information, visit https://www.lacourt.org/division/civil/CI0047.aspx.

**<u>Los Angeles Superior Court ADR Programs for Limited Civil (cases valued below $35,000)</u>**
Litigants should closely review the requirements for each program and the types of cases served.

- **Online Dispute Resolution (ODR).** Online Dispute Resolution (ODR) is a free online service provided by the Court to help small claims and unlawful detainer litigants explore settlement options before the hearing date without having to come to court. ODR guides parties through a step-by-step program. After both sides register for ODR, they may request assistance from trained mediators to help them reach a customized agreement. The program creates settlement agreements in the proper form and sends them to the Court for processing. Parties in small claims and unlawful detainer cases must carefully review the notices and other information they receive about ODR requirements that may apply to their case. *For more information, visit https://my.lacourt.org/odr.*

- **Dispute Resolution Program Act (DRPA) Day-of-Hearing Mediation.** Through the Dispute Resolution Program Act (DRPA), the Court works with county-funded agencies, including the Los Angeles County Department of Consumer & Business Affairs (DCBA) and the Center for Conflict Resolution (CCR), to provide voluntary day-of-hearing mediation services for small claims, unlawful detainer, limited civil, and civil harassment matters. DCBA and CCR staff and trained volunteers serve as mediators, primarily for self-represented litigants. There is no charge to litigants. *For more information, visit https://dcba.lacounty.gov/countywidedrp.*

- **Temporary Judge Unlawful Detainer Mandatory Settlement Conference Pilot Program.** Temporary judges who have been trained as settlement officers are deployed by the Court to designated unlawful detainer court locations one day each week to facilitate settlement of unlawful detainer cases on the day of trial. For this program, cases may be ordered to participate in a Mandatory Settlement Conference (MSC) by judicial officers at Stanley Mosk, Long Beach, Compton, or Santa Monica. Settlement rooms and forms are available for use on the designated day at each courthouse location. There is no charge to litigants for the MSC. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

# EXHIBIT D

FILED
Superior Court of California
County of Los Angeles

04/28/2025

David W. Slayton, Executive Officer / Clerk of Court

By: _____ Deputy
          M. Arellanes

Andrew Parker Felix (SBN 276002)
MORGAN & MORGAN, P.A.
633 West Fifth Street, Suite 2200
Los Angeles, CA 90071
Telephone: (407) 244-3209
Facsimile: (407) 245-3334
andrew@forthepeople.com

R. Allen Smith, Jr. (*pro hac vice forthcoming*)
THE SMITH LAW FIRM, PLLC
300 Concourse Blvd., Suite 104
Ridgeland, MS 39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426
Email: asmith@smith-law.org
*Attorneys for Plaintiff*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| HOLLY WHITE, Individually, and as Successor-In-Interest of BEVERLY WHITE, Deceased<br><br>          Plaintiff,<br><br>vs.<br><br>L'ORÉAL USA, INC., a Delaware Corporation doing business in California,<br><br>L'ORÉAL USA PRODUCTS, INC., a Delaware Corporation doing business in California,<br><br>WELLA PROFESSIONALS, a Delaware Corporation doing business in California,<br><br>COTY, INC., a Delaware Corporation doing business in California, | Case No.: <u>25STCV12023</u><br><br>Department: _____<br><br>Judge: _____<br><br>**AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL:**<br><br>1. **Strict Liability – Failure to Warn**<br>2. **Strict Liability – Design Defect – Risk-Utility Test**<br>3. **Strict Liability – Design Defect – Consumer Expectations Test**<br>4. **Negligent Failure to Warn**<br>5. **Deceit by Concealment**<br>6. **Violations of California Unfair Competition Law (UCL)**<br>7. **Wrongful Death**<br>8. **Survival** |

Electronically Received 04/28/2025 03:18 PM

1

2

CLAIROL, a Connecticut Corporation doing business in California,

3

KOHLBERG KRAVIS ROBERT & CO. a/k/a KKR & CO., INC., a Delaware Corporation doing business in California,

4

5

BRISTOL-MYERS SQUIBB, a Delaware Corporation doing business in California,

6

7

PROCTER & GAMBLE HAIR CARE, LLC, A Delaware Corporation doing Business in California,

8

9

JOICO, a California Corporation doing business in California,

10

11

SCHWARZKOPF, a German Corporation doing business in California,

12

13

PRAVANA, a California Corporation doing business in California,

14

15

HENKEL a/k/a HENKEL AG & Co. KGaA, a German Corporation doing business in California,

16

17

GOLDWELL NEW YORK, a foreign company doing business in California,

18

19

COSMOPROF SERVICES USA, LLC, a California company doing business in California,

20

21

SALLY BEAUTY HOLDINGS, INC., a Texas Corporation doing business in California,

22

23

24

GOLDWELL, a foreign company doing business in California,

25

26

KAO CORPORATION, a foreign Corporation doing business in California,

27

28

JOHN PAUL MITCHELL SYSTEMS, a

California Corporation doing business in California, and

JOHN DOE CORPORATIONS 1-100, inclusive,

    Defendants.

Plaintiff HOLLY WHITE herein (referred to as "Plaintiff"), by and through counsel, for her causes of action against the Defendants, files the herein Amended Complaint and alleges as follows:

## I.    <u>PARTIES</u>

1.    Plaintiff HOLLY WHITE is a competent individual, over the age of 18, a Citizen of the United States, and a resident of Marion County in the state of Indiana.  Plaintiff is the surviving child, heir, and successor-in interest of Decedent BEVERLY WHITE. As successor-in-interest, HOLLY WHITE has standing in a representative capacity as the heir to bring actions on behalf of the heir for survival and wrongful death pursuant to the laws of the State of California. Decedent BEVERLY WHITE was a licensed cosmetologist from 1960 until her retirement in May of 2003.

2.    All claims in this action are a direct and proximate result of the negligent, willful, and wrongful acts and/or omissions of Defendants and/or their corporate predecessors in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the products by L'ORÉAL USA, INC.; L'ORÉAL USA PRODUCTS, INC.; WELLA PROFESSIONALS; COTY, INC.; CLAIROL; KOHLBERG KRAVIS ROBERT & CO. a/k/a KKR & CO., INC.; BRISTOL-MYERS SQUIBB; PROCTER & GAMBLE HAIR CARE, LLC; JOICO; SCHWARZKOPF; PRAVANA; HENKEL; GOLDWELL; JOHN PAUL MITCHELL SYSTEMS; PAUL MITCHELL; and JOHN DOE CORPORATIONS 1-100; known as, Paul Mitchell, Wella, Redken, Matrix, Color Gel, Color Charm, Clairol Professional, Lumishine, Palette, Top Chic, So Color, Color XG, and The Color (hereinafter "the PRODUCTS").  Plaintiff in this action seeks recovery for damages as a result of developing bladder cancer, which was directly and proximately caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature of hair dyes, and the attendant effects of developing bladder cancer.  All of the claims in this action involve common legal, common factual, and common medical issues.

3.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant L'ORÉAL USA, INC., is a corporation doing business in and authorized to

do business in the state of California, and was incorporated in Delaware.  L'ORÉAL USA, INC., is a subsidiary of the French cosmetics giant L'Oréal S.A., the world's largest cosmetic company.

4.      Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant L'ORÉAL USA, INC., maintains an office and principal place of business and headquarters located at 10 Hudson Yards, New York, New York 10001, and process may be served upon its registered agent, Corporation Service Company which does business in California as CSC- Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

5.      Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant L'ORÉAL USA, INC., is engaged in the manufacturing, packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.  In addition to manufacturing and distributing products using the "L'Oréal" brand, L'Oréal also manufactures and distributes products using the "Redken" and "Matrix" brand, including Cosmetic Products at issue here, throughout the United States.

6.      Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant L'ORÉAL USA PRODUCTS, INC., is a corporation doing business in and authorized to do business in the state of California, with its principal place of business and headquarters at 10 Hudson Yards, New York, New York 10001, and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

7.      Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant L'ORÉAL USA PRODUCTS, INC., is engaged in the manufacturing, packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.  In addition to manufacturing and distributing products using the "L'Oréal" brand, L'Oréal also manufactures and distributes products using the "Redken" and "Matrix" brand, including Cosmetic Products at issue here, throughout the United States.

8.      Plaintiff is informed and believes, and based thereon alleges, that at all times relevant MATRIX PROFESSIONAL HAIR is part of L'ORÉAL USA, INC.'s Professional Products Division.  MATRIX was founded in 1980 and acquired by L'ORÉAL USA, INC. in

2000.

9.      Plaintiff is informed and believes, and based thereon alleges, that at all times relevant REDKEN is part of L'ORÉAL USA, INC.'s Professional Products Division.  REDKEN was founded in 1960 and acquired by L'ORÉAL USA, INC. in 1993.

10.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant WELLA PROFESSIONALS, is a corporation doing business in and authorized to do business in the State of California, with its principal place of business and headquarters at 10 Hudson Yards, New York, New York 10001, and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

11.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant COTY, INC., is a corporation doing business in and authorized to do business in the State of California, and was incorporated in Delaware. COTY, INC., is an American multinational beauty company founded in 1904 by Francois Coty.

12.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant COTY, INC., maintains an office and principal place of business and headquarters located at 350 Fifth Avenue, New York, New York 10118, and process may be served upon its registered agent, Corporation Service Company which does business in California as CSC- Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

13.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant COTY, INC., is engaged in the manufacturing, packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.  In addition to manufacturing and distributing products using the "Coty" brand, Coty also manufactures and distributes products using the "Wella" and "Clairol" brand, including Cosmetic Products at issue here, throughout the United States.

14.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant WELLA is part of COTY, INC.'s Professional Products Division.  WELLA was founded in 1880 and acquired by COTY, INC., in 2015.  In 2020, COTY, INC., sold a stake

in the WELLA brand to the private equity firm, KKR & CO., INC., while retaining percentages of the stake.  In 2021, COTY, INC., sold additional percentages of stakes in WELLA to KKR & CO., INC., while continuing to retain percentages of the stake in WELLA.  In 2023 COTY, INC., sold a stake in WELLA to the investment firm of IGF WEALTH MANAGEMENT with COTY retaining percentages in WELLA.

15.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant WELLA is a Delaware corporation that maintains a corporate office and principal place of business and headquarters located at 350 Fifth Avenue, New York, New York 10118, and process may be served upon its registered agent, Corporation Service Company which does business in California as CSC- Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

16.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant CLAIROL is part of the personal care-product division of WELLA that specializes in hair coloring and hair care.  WELLA is part of COTY, INC.'s Professional Products Division.  CLAIROL was founded in 1931 and acquired by COTY, INC., in 2016.  In 2020, COTY, INC., sold a stake in the CLAIROL brand to the private equity firm, KKR & CO., INC., while retaining percentages of the stake.

17.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant CLAIROL maintains a corporate office located at 1 Blachley Road, Stamford, Connecticut 06922.  CLAIROL, as part of COTY, INC., is a Delaware corporation that maintains a corporate office and principal place of business and headquarters located at 350 Fifth Avenue, New York, New York 10118, and process may be served upon its registered agent, Corporation Service Company which does business in California as CSC- Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

18.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant KOHLBERG KRAVIS ROBERTS & CO., a/k/a KKR & CO., INC., is a corporation doing business in and authorized to do business in the State of California, and was incorporated in Delaware.  KOHLBERG KRAVIS ROBERTS & CO., a/k/a KKR & CO., INC.,

is a global investment company that acquired the majority stake in WELLA and CLAIROL in 2020.

19.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant KOHLBERG KRAVIS ROBERTS & CO., a/k/a KKR & CO., INC., maintains an office and principal place of business and headquarters located at 9 West 57th Street, Suite 4200, New York, New York 10019, and process may be served upon its registered agent, Corporate Creations Network, Inc., 7801 Folsom Blvd., #202, Sacramento, California 95826.

20.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant CLAIROL was sold to BRISTOL-MYERS in 1957.  BRISTOL-MYERS merged with SQUIBB CORPORATION to form BRISTOL-MYERS SQUIBB in 1989. PROCTER & GAMBLE purchased the CLAIROL division from BRISTOL-MYERS SQUIBB in 2001.  BRISTOL-MYERS SQUIBB is a corporation doing business in and authorized to do business in the State of California, and was incorporated in Delaware.

21.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant BRISTOL-MYERS SQUIBB maintains an office and principal place of business and headquarters located at Route 206 and Province Line Road, Princeton, New Jersey 08543, and process may be served upon its registered agent, CT Corporation System, 330 North Brand Boulevard, Glendale, California 91203.

22.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant PROCTER & GAMBLE purchased the CLAIROL division from BRISTOL-MYERS SQUIBB in 2001. In 2016 CLAIROL was acquired by COTY from PROCTER & GAMBLE as part of a beauty brand acquisition.  PROCTER & GAMBLE is a corporation doing business in and authorized to do business in the State of California, and was incorporated in Delaware.

23.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant PROCTER & GAMBLE HAIR CARE, LLC, is a subsidiary of PROCTER & GAMBLE and maintains an office and principal place of business and headquarters located at 1 Procter & Gamble Plaza, Cincinnati, Ohio 45202, and process may be served upon its registered

agent, CT Corporation System, 330 North Brand Boulevard, Glendale, California 91203.

24.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant PRAVANA was founded by Steve Goddard in 2004, and in 2017 was acquired by HENKEL a/k/a HENKEL AG & Co. KGaA (hereinafter referred to as "HENKEL"). The acquisition comprised of leading hair professional brands such as PRAVANA.

25.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant PRAVANA maintains an office and principal place of business and headquarters located at 5800 Bristol Parkway, Suite 7, Culver City, California 90230.  PRAVANA, as a division of HENKEL, may be served through its parent company, HENKEL, upon its registered agent, Corporation Service Company which does business in California as CSC- Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

26.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant JOICO was founded by Steve Stefano and in 2001 was acquired by Zotos International, Inc., which is also a subsidiary of Shiseido Company, Limited.  Thereafter, in 2017, HENKEL acquired Zotos International, Inc., the North American Hair Professional business of Shiseido Company, Limited.  The acquisition comprised of leading hair professional brands such as JOICO and Zotos Professional.

27.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant JOICO maintains an office and principal place of business and headquarters located at 5800 Bristol Parkway, Culver City, California 90230.  JOICO, as a division of HENKEL, may be served through its parent company, HENKEL, upon its registered agent, Corporation Service Company which does business in California as CSC- Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

28.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant SCHWARZKOPF, INC. (hereinafter referred to as "SCHWARZKOPF"), was founded by Hans Schwarzkopf in 1898 and in 2015 was acquired by HENKEL.

29.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant SCHWARZKOPF maintains an office and principal place of business and

headquarters located at 5800 Bristol Parkway, Culver City, California 90230. SCHWARZKOPF, as a division of HENKEL, may be served through its parent company, HENKEL, upon its registered agent, Corporation Service Company which does business in California as CSC-Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

30.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant HENKEL maintains an office and principal place of business and headquarters located at One Henkel Way, Rocky Hill, Connecticut 06067, and process may be served upon its registered agent, Corporation Service Company which does business in California as CSC-Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

31.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendants JOICO, as a division of HENKEL, PRAVANA, SCHWARZKOPF and HENKEL are engaged in the manufacturing, packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.

32.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant GOLDWELL NEW YORK was founded by Hans and Steven Neumaier in 1976 and was acquired by COSMOPROF SERVICES USA, LLC (hereinafter referred to as "COSMOPROF") in 2005. On September 1, 2023, COSMOPROF was acquired by parent company SALLY BEAUTY HOLDINGS, INC (hereinafter referred to as "SALLY BEAUTY"). SALLY BEAUTY maintains an office and a principal place of business at its headquarters located at 3001 Colorado Boulevard, Denton, Texas 76210.

33.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant GOLDWELL NEW YORK maintains an office and principal place of business and headquarters located at 2117 Brighton Henrietta Town Line Road, Rochester, New York 14623. GOLDWELL NEW YORK, as a division of COSMOPROF, may be served through Denise Paulonis, Chief Executive Officer, of its parent company, SALLY BEAUTY, at its headquarters located at 3001 Colorado Boulevard, Denton, Texas 76210.

---

34.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant COSMOPROF maintains an office and principal place of business and headquarters at 4823 Promenade Parkway, Bessemer, Alabama 35022. COSMOPROF, as a division of SALLY BEAUTY, may be served through Denise Paulonis, Chief Executive Officer, of its parent company, SALLY BEAUTY, at its headquarters located at 3001 Colorado Boulevard, Denton, Texas 76210.

35.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant SALLY BEAUTY maintains an office and principal place of business and headquarters at 3001 Colorado Boulevard, Denton, Texas 76210. SALLY BEAUTY may be served through Denise Paulonis, Chief Executive Officer, at 3001 Colorado Boulevard, Denton, Texas 76210.

36.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendants GOLDWELL NEW YORK, COSMOPROF, and SALLY BEAUTY are engaged in the manufacturing, packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.

37.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant GOLDWELL was founded by Hans Erich Dotter in 1948. In 1989 GOLDWELL sold a 75% stake of its company to KAO CORPORATION. In 1994 KAO CORPORATION acquired the remaining 25% stake in GOLDWELL. GOLDWELL, as a division of KAO CORPORATION, may be served through Karen B. Frank, Key Principal, of its parent company, KAO CORPORATION, at its United States headquarters located at 2535 Spring Grove Avenue, Cincinnati, Ohio 45214.

38.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant KAO CORPORATION maintains an office and principal place of business and headquarters located at 2535 Spring Grove Avenue, Cincinnati, Ohio 45214. KOA CORPORATION may be served through Karen B. Frank, Key Principal, at its United States headquarters located at 2535 Spring Grove Avenue, Cincinnati, Ohio 45214.

39.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant

times Defendants GOLDWELL and KAO CORPORATION are engaged in the manufacturing, packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.

40.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant Defendant JOHN PAUL MITCHELL SYSTEMS (hereinafter referred to as "JPMS"), is a corporation doing business in and authorized to do business in the state of California, and was incorporated in California. JPMS, was founded in 1980 and is a manufacturer of hair care producing and styling tools through several brands, including Paul Mitchell.

41.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant JPMS, maintains an office and principal place of business and headquarters located at 20705 Centre Pointe Parkway, Santa Clarita, California 91350, and process may be served upon its registered agent, CT Corporation System, 330 North Brand Boulevard, Suite 700, Glendale, California 91203.

42.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times Defendant JPMS, is engaged in the manufacturing, packaging, advertising, and distributing of many consumer products, including the Cosmetic Products at issue here, throughout the United States.  In addition, JPMS manufactures and distributes products using the "Paul Mitchell" brand, including Cosmetic Products at issue here, throughout the United States

43.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the true names or capacities, whether individual, corporate, or otherwise, of JOHN DOE CORPORATIONS 1-100, inclusive, are unknown to the Plaintiff at the time of original filing of the underlying complaint in this action and, therefore, sues said Defendants by such fictitious names.  Plaintiff prays leave to amend this Complaint to show their true names and capacities and/or bases for liability when the same have been finally determined.

44.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the true names or capacities, whether individual, corporate, or otherwise, of JOHN DOE CORPORATIONS 1-100, inclusive, remain unknown to Plaintiff and, therefore Plaintiff sues said Defendants by such fictitious names.  Plaintiff is informed and believes and based thereon

alleges that each of the Defendants designated herein by fictitious names is some manner legally responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to Plaintiff as alleged herein.

45.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the true names or capacities, whether individual, corporate, or otherwise, of JOHN DOE CORPORATIONS 1-100, inclusive, and Other Defendants named by Plaintiff are collectively referred to herein as "Defendants" and all acts and omissions of Defendants as alleged herein were undertaken by each of the Defendants or said Defendants' agents, servants, employees, and/or owners, acting in the course and scope of its respective agencies, services, employments and/or ownerships.

46.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant to this action, all Defendants were engaged in the research, development, manufacture, design, testing, sale, and marketing of the PRODUCTS, and introduced such products into interstate commerce with knowledge and intent that such products be sold in the State of California.

47.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times material hereto, Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective products, including but not limited to the following:

a.    L'Oreal

b.    Matrix

c.    Redken

d.    Wella

e.    Clairol

f.    Joico

g.    Pravana

h.    Schwarzkopf

i.    Goldwell

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL                    PAGE 13 OF 42

1          j.    Paul Mitchell

2          48.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant

3    times material hereto, Defendants marketed these products to the general public and sold both to

4    retail outlets and distributors throughout the world.

5          49.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant

6    times material hereto, Defendants have engaged in substantial, continuous economic activity in

7    California, including marketing, distribution, and sale of billions of dollars in products to the

8    public in California, including but not limited to the aforementioned products, that said activity

9    by Defendants is substantially connected to the Plaintiff's claims as alleged herein.

10          50.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant

11    times material hereto, Defendants' defective hair products were placed into the stream of

12    interstate commerce and which Decedent was exposed from approximately 1960 to

13    approximately 2003.

14          51.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant

15    times material hereto, Decedent worked in a salon as a professional hair dresser/cosmetologist for

16    approximately 43 years thus exposing Decedent to said PRODUCTS from approximately 1960

17    until she retired in May of 2003.

18          52.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant

19    times material hereto, Decedent worked in a salon as a professional hair dresser/cosmetologist

20    working with and/or around said PRODUCTS through her normal day to day duties as a

21    professional hair dresser/cosmetologist. In her capacity as a professional hair

22    dresser/cosmetologist, Decedent worked coloring hair at least two to three times a day for five

23    days a week that exposed her to said PRODUCTS on a daily basis from approximately 1960

24    through approximately 2003.

25          53.    Upon information and belief, beginning in approximately 1960, Decedent, while

26    a citizen in the state of Indiana, was exposed to PRODUCTS purchased by or through the salon

27    where she was employed, Futuristic Salon.  Prior to her death, Decedent was further exposed by

28    mixing, applying, cleaning, inhaling, and removing hair color PRODUCTS and any residue from

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL          PAGE 14 OF 42

bowls, brushes, towels, sinks, and tabletops, on a daily basis throughout her time spent in hair salons and while employed in hair salons from approximately 1960 through approximately 2003.

54.     Plaintiff is informed and believes, and based thereon alleges, that in November of 2024 Decedent was diagnosed with bladder cancer resulting in her subsequent death on January 20, 2025, and suffered effects and sequelae therefrom, caused by her regular and prolonged use and exposure to chemicals in the PRODUCTS while a citizen and resident of the state of Indiana, which was a direct and proximate result of the unreasonably dangerous and defective nature of the Defendants' hair color PRODUCTS and the chemicals contained therein, and Defendants' wrongful and negligent conduct in the research, development, testing, manufacture, production, formulation, processing, packaging, promotion, distribution, marketing and sale of the PRODUCTS.

55.     Upon information and belief, as a direct and proximate result of the injuries alleged herein, Plaintiff has incurred medical expenses and other special damages which survive the death of the Decedent. Prior to her death, Decedent endured pain and suffering, loss of enjoyment of life, and death. Plaintiff has otherwise been damaged in a personal and pecuniary nature.

56.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, all allegations concerning Defendants includes Defendants' parent companies, subsidiaries, affiliates, divisions, franchises, partners, joint ventures, organizational units of any kind, predecessors, successors and assigns, and their officers, directors, employees, agents, representatives, and any and all other persons acting on behalf of Defendants.

57.     Plaintiff is informed and believes, and based thereon alleges that, all claims in this action are a direct and proximate result of Defendants' and/or their corporate predecessors negligent, willful, and wrongful conduct by Defendants' design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling and/or sale of the PRODUCTS.

## JURISDICTION AND VENUE

58.     This Court has subject matter jurisdiction over this action pursuant to Article 6, Section 10 of the Constitution of the State of California.

59.     This Court has personal jurisdiction over Defendants because they are authorized

to do business and they do conduct business in California, have specifically marketed, advertised, and made substantial sales in California, and have sufficient minimum contacts with this state and/or sufficiently avails themselves of the markets of this state through their promotion, sales, and marketing within this state to render the exercise of jurisdiction by this Court permissible.

60.    Venue is proper in this Court because one or more of the Defendants resides and maintains its principal place of business in Los Angeles County, California and the convenience of the witnesses and the ends of justice will be promoted by allowing this case to proceed in Los Angeles County, California.

61.    Defendants' PRODUCTS were all sold either directly or indirectly, to members of the general public within the State of California.

62.    At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within the United States and the State of California.

## II.    FACTUAL ALLEGATIONS

### A.    Products at Issue

63.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

64.    There are at least ten products at issue in this case manufactured and marketed by Defendants during this time period.

65.    Upon information and belief, at all relevant times alleged herein, Defendants advertised and marketed the PRODUCTS as safe for use.

66.    Decedent was exposed to the PRODUCTS while spending time in a salon and while working in a salon.  This was an intended and foreseeable use of the PRODUCTS based on the advertising, marketing, and labeling of the PRODUCTS.

### B.    FDA Regulation of Cosmetics

67.    Cosmetics marketed in the United States must comply with the Federal Food, Drug, and Cosmetic Act (FD&C Act), and Fair Packaging and Labeling Act (FP&L Act).  The FD&C Act defines cosmetics as articles intended to be applied to the human body for cleansing, beautifying, promoting attractiveness, or altering appearance without affecting the body's

structure or functions.  Hair Dyes are included in this definition.

68.    The label statements required under the authority of the FD&C Act must appear on the inside as well as the outside container or wrapper. The labeling requirements are codified at 21 CFR 701 and 740.  Cosmetics not labeled in accordance with the requirements may be considered misbranded and may be subject to regulatory action.

69.    Cosmetics must bear warning labels prescribed by (21 CFR 740).  The warning label on a cosmetic must be appropriate and contain adequate directions for safe use.  The warning label on a cosmetic must be prominent and conspicuous.  Specifically, 21 CFR §740.1(a) establishes warning statements for cosmetics such as hair dye.  The Code states "The label of a cosmetic product **shall** bear a warning statement whenever necessary or appropriate to prevent a health hazard that **may be** associated with the product."

70.    The cosmetic industry is self-regulated by manufacturers of cosmetic products.  The FD&C Act does not require cosmetics, including hair dyes, to be approved by the FDA before they go on the market.  The FD&C Act does not require specific tests to ensure the safety of cosmetic ingredients or final products.  Also, the FD&C Act does not require cosmetic companies to share their safety information with the FDA.  Therefore, the manufacturers of cosmetics are solely and legally responsible for ensuring the safety of their products to the public and making sure they are properly labeled.

**C.    Hair Dyes**

71.    Hair dye usage is very common in the United States with 75% of women and 38% of men regularly coloring their hair every 6-8 weeks.  US hair dye sales total $2 billion dollars per year with world-wide sales of $12 billion dollars per year.   64% of people colored their hair black, 16% brown, and 20% preferred another color.  33% of people in the US preferred to have their hair colored in a salon.

72.    Hair dyes use chemicals to change hair color.  The three main types of hair dye are: permanent, semi-permanent, and temporary.  Permanent hair dyes cause lasting chemical changes in the hair shaft, and last until the hair is replaced by new growth. Permanent hair dyes make up about 80% of the market and use colorless dye intermediates and dye couplers.  When

mixed with hydrogen peroxide the intermediates and couplers react with each other to form pigment molecules.  Darker colors are formed by using higher concentrations of intermediates.  Semi-permanent hair dyes do not penetrate into the hair shaft, and typically last for about 10 washings.  Temporary hair dyes cover the surface of the hair and do not penetrate into the hair shaft.  They generally last for 1 to 2 washings.

73.    Hundreds of chemicals are used to make hair dyes, many are carcinogenic.

74.    People that are exposed to hair dyes frequently as part of their occupation such as hairdressers, cosmetologists, hair colorists, barbers, and salon workers have higher lifetime exposures to these carcinogenic chemicals than people who have their hair dyed in a salon or who dye it at home.

75.    In 2010, the International Agency for Research on Cancer (IARC) completed its comprehensive review and found that based on excessive risk of bladder cancer from occupational exposure to hair dyes the hairdressing occupation was listed as a Group 2A "probably carcinogenic to humans".

**D.    Studies on Bladder Cancer/Occupational Exposure**

76.    In the United States there are approximately 83,000 bladder cancer diagnoses per year, and approximately 16,000 deaths.  Bladder cancer is the ninth most common cancer in the United States.

77.    Most bladder cancer tumors form after an individual is exposed to carcinogens that enter the body through inhalation, dermal contact, or ingestion.  The two most frequent routes of exposure are through cigarette smoke and occupation.  It is estimated that 5 percent of all bladder cancer diagnoses result from occupational exposure.

78.    In 1975, a peer-reviewed study published by Bruce Ames found that nearly 90% of commercially available hair dyes were mutagenic indicating a potential to cause DNA damage which could lead to cancer development.  Safety concerns were raised in this study due to the presence of mutagenic hair dye intermediates called aromatic amines.  In response to the Ames study, manufacturers supposedly changed the components in permanent hair dye products in an effort to eliminate carcinogenic chemicals.  Manufacturers represented to the FDA and the public

that now hair dyes were safe for use. Carcinogenic aromatic amines supposedly removed by manufacturers at this time were 4-aminobiphenyl, o-toluidine, benzidine, and 2-naphthylamine, among many others. However, studies conducted since the 1970s conclusively prove that manufactures failed to remove carcinogenic aromatic amines from its hair dye products.

79.     In 1994, a meta-analysis was conducted entitled *Epidemiological Evidence on Hair Dyes and the Risk of Cancer in Humans.* This meta-analysis consisted of 7 cohort studies and 11 case control studies which included data on occupational exposure to hair dyes by hairdressers, barbers, and beauticians and their subsequent bladder cancer risk. The study found that **"The association between past occupational exposure to hair colourants and bladder cancer risk is reasonably consistent on epidemiological data and plausible on biological grounds…the general evidence from case control studies is in agreement with that from cohort investigations, and is compatible with a moderately increased bladder cancer risk among hairdressers and barbers."**

80.     In 2001, a study entitled *Use of Permanent Hair Dyes and Bladder-Cancer Risk Case Control Study* was published by Gago-Dominguez among others. The study found that individuals that used hair dye once per month more than doubled their risk for bladder cancer, and among those that used hair dyes for once a month for 15 or more years tripled their risk. **The study further found that occupational exposures of hairdressers and barbers that were likely exposed to hair dyes for 10 or more years increased their risk of bladder cancer fivefold.** The study concluded that long-term use of permanent hair dyes is a risk factor for bladder cancer and estimated 19% of bladder cancer diagnoses in women in Los Angeles County could be attributed to permanent hair dye usage.

81.     In 2003, the FDA published a peer-reviewed study entitled, *Identification of Aminobiphenyl Derivatives in Commercial Hair Dyes*. **This study found up to 12.8 ppb of 4-Aminobiphyenyl (4-ABP), a known bladder carcinogen, in 8 out of 11 tested commercial hair dyes.**

82.     In 2008, a study entitled *A Meta-Analysis on the Association Between Bladder Cancer and Occupation,* was published. The study found that hairdressers had a statistically

significant 23% increased risk of bladder cancer, *(1.23 RR, 95%, CI 1.11-1.37)*.  The scientists stated ***"Although the relative risk of bladder cancer associated with these occupations is small, the public health impact may be significant, considering the substantial number of people who were and are employed in these occupations."***

83.    In 2008, a study was published entitled *Elevated Bladder Cancer Risk Due to Colorants-A Statewide Case-Control Study in North Rhine-Westphalia, Germany*.  The study's questionnaire asked about occupation for more than 6 months and for exposures to several occupational and nonoccupational bladder carcinogens, and was limited to diagnoses of bladder cancer after 1988.  The study concluded that individuals exposed to hair colorants showed a nearly fivefold elevated bladder cancer risk (OR 4.9% for hairdressers).  The scientists stated, **"The results of this epidemiological study confirm the hypothesis that individuals exposed to colorants show an elevated bladder cancer risk."**

84.    In 2008, **a second study was published that found 4-ABP, and known bladder carcinogen, in hair dyes.  The study found 4-ABP in 28 of 54 commercial hair dyes.  In addition, this study found the presence of a second known bladder carcinogen, Ortho-Toluidine in 34 of 54 commercial hair dyes tested.**  *Determination of aromatic amines in hair dye and henna samples by ion-pair extraction and gas chromatography-mass spectrometry,* Akyuz (2008).

85.    In 2009, Harling and others published *Bladder Cancer Among Hairdressers: A Meta-Analysis.*  42 studies were included and this meta-analysis and statistically significant increased risks for bladder cancer were found for all but one analysis. The risk increased with duration of employment from 1.30 (95% CI 1.15 to 1.48) for 'ever registered as hairdressers' to 1.70 (95% CI 1.01 to 2.88) for 'job held greater than or equal to 10 years'.  The study concluded by stating **"The results of the present meta-analysis on 42 studies suggest that there is robust evidence for an increased risk of bladder cancer among hairdressers, in particular for hairdressers in a job held greater than or equal to 10 years . . . This corroborates the interpretation that there is a causal association between bladder cancer and job held as a hairdresser."**

86.     In 2014, **a third study was published that found known bladder carcinogens present in hair dyes.**  The study entitled *Exposure of Hairdressers to ortho-toluidine (known bladder carcinogen) and meta-toluidine in hair dyes*, included a questionnaire that asked if the subjects were currently employed as a hairdresser in last 4 months, other jobs/hobbies, lifestyle, treatments per week of permanent/semi hair dye, type of gloves used, frequency of glove use (90%), and frequency they changed gloves.  Other occupational exposures were ruled out by asking about other jobs held within the past 6 months that would expose hairdressers to dyes. Blood samples were taken, and hemoglobin (Hb) adducts were analyzed for the presence of ortho-toluidine.  **The study found that hairdressers using permanent hair dyes and waving products were exposed to ortho-toluidine and the amount of ortho- toluidine in blood increased with increasing number of weekly hair dye treatments**.  The study also stated that the analyses of Hb adducts in exposed hairdressers is the best method for monitoring long-term exposure to aromatic amines because of the lifetime of Hb is about 4 months, and because of the close relationship with DNA adducts.

87.     The most recent global meta-analysis, published in 2015 in JAMA Oncology, looked at all types of occupations and risk for bladder cancer, and reported on those occupation classes that were associated with increased bladder cancer risk. (Cumberbatch et al. 2015)  The authors conducted a systematic review search for studies through May 2014. Eligible studies focused primarily on bladder cancer and provided confidence intervals (or data for calculating them). There were 217 reports available and eligible for meta-analyses; of these, 42 (of 61) occupational classes showed elevated relative risks for bladder cancer incidence and 16 (of 40) occupational classes showed increased bladder cancer mortality risk. Reduced risk of bladder cancer incidence and mortality were reported for only 6 and 2 occupational classes, respectively. The number of studies that reported on hairdressing occupation was not given, but the data tables indicated that 47 "comparisons" were used in determining relative risk for bladder cancer with hairdressing occupation. The authors summarized data over the studies as Standard Incidence Ratios (SIR) or Standard Mortality Ratios (SMR). Overall, the risk for bladder cancer among hairdressers was increased by 32% (SIR 1.32, 95% CI 1.24-1.4). The risk for bladder cancer

mortality increased by 16% (SIR 1.16, 95% CI 1.01-1.34). **The study also found that the risk of bladder cancer was highest in occupations in which workers were exposed to aromatic amines (rubber, plastic, and dye workers, hairdressers, and painters).** The scientists listed the aromatic amines of 4-ABP and Ortho-Toluidine as "definitive bladder carcinogens", that the main carcinogen for hairdressers is 4-amino-biphenyl (4-ABP), and that historical reports showed that **16%-19% of workers exposed to 4-ABP contract bladder cancer**.

**E.    4-Aminobiphenyl and Ortho-Toluidine are Human Carcinogens**

88.    Chemical agents are classified according to their surety of cancer risk.  There are two institutions that identify, evaluate, and classify human carcinogens.   The first is the International Agency for the Research of Cancer (IARC).  The second is the National Toxicology Program (NTP).

89.    IARC is part of the World Health Organization (WHO) that conducts and coordinates research into causes of cancer.  It also collects and publishes surveillance data regarding the occurrence of cancer worldwide.  Its published "Monographs" identify carcinogenic hazards and evaluate environmental causes of cancer in humans.

90.    The National Toxicology Program (NTP) is program within the Department of Health and Human Services (DHHS) headquartered at the National Institute of Environmental Health Sciences (NIEHS) of the National Institutes of Health (NIH). NTP evaluates chemicals of concern for their potential to cause cancer in humans. As part of their cancer evaluation work, NTP publishes their Report on Carcinogens (RoC).  RoC is a document that identifies chemicals that may pose a carcinogenicity hazard to human health. The NTP RoC classifies chemicals as either "known to be a human carcinogen" or "reasonably anticipated to be a human carcinogen."

91.    IARC classified 4-Aminobiphenyl and Ortho-Toluidine as carcinogenic to humans (Group 1). IARC stated that both 4-ABP and O-T have been found in hair dyes.

92.    The NTP (RoC) classified 4-Aminobiphenyl and Ortho-Toluidine as "known to be a human carcinogen".   The NTP also stated that 4-ABP and O-T have been found in hair dyes.

**F.    Biological Mechanism of Action by 4-Aminobiphenyl and Ortho-Toluidine**

93.    4-ABP and o-toluidine have been found in DNA adducts of the bladder and

mammary glands in exposed humans which are biological markers that allow for identification of agents responsible for initiation of carcinogenic processes also reflecting exposure, biological effective dose, and local metabolic processes involved in formation of reactive species capable of binding to DNA and other macromolecules.  Gorlewska-Roberts (2002), *Carcinogen-DNA Adducts in Human Breast Epithelial Cells*.

94.     According to IARC and the NTP, 4-ABP causes cancer through a mechanism involving metabolic activation in the liver, where it is converted into a reactive N-hydroxy derivative which then forms DNA adducts, primarily by generating a highly reactive aryl nitrenium ion, ultimately leading to DNA damage and contributing to the development of bladder cancer, particularly in humans; this process is considered the primary mechanism of action for 4-ABP.  While the metabolism occurs primarily in the liver, the reactive metabolites are transported to the bladder, where they can readily bind to DNA due to the acidic urine environment, leading to bladder cancer development.

95.     According to IARC and NTP, ortho-toluidine's primary mechanism of action is through its metabolic activation to a highly reactive electrophilic metabolite, N-hydroxy-ortho-toluidine, which can directly bind to DNA, causing DNA adducts and ultimately leading to mutations that can contribute to bladder cancer development, particularly with prolonged exposure; this is considered the primary route of carcinogenicity associated with ortho-toluidine. The bladder is considered the primary target tissue for ortho-toluidine-induced cancer due to its high levels of metabolic enzymes and the ability of the urinary tract to concentrate the metabolite.

### III.     CLAIMS FOR RELIEF

### COUNT 1.  STRICT LIABILITY – FAILURE TO WARN

96.     Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

97.     On information and belief, Defendants manufactured, distributed, and sold the hair dye PRODUCTS that Decedent used and/or was exposed to at an early age.

98.     On information and belief, the PRODUCTS had potential risk and side effects that were known or knowable in light of the scientific and medical knowledge that was generally

accepted in the scientific community at the time of their manufacture, distribution and sale.

99.    On information and belief, the potential risks and side effects presented a substantial danger when the PRODUCTS were used or misused in an intended or reasonably foreseeable way.

100.    On information and belief, ordinary consumers would not have recognized the potential risks and side effects described herein.

101.    On information and belief, Defendants failed to adequately warn or instruct of the potential risks and side effects as evidenced through the following conduct:

    a.    Omitting warnings on product labels or from other marketing materials the warning that use of and/or exposure to the PRODUCTS could lead to an increased risk of bladder cancer.

    b.    Representing on the labeling and in their marketing materials that Defendants PRODUCT is safe for use as directed.

    c.    Failing to inform its customers and end users of the PRODUCTS, including Plaintiff, of a known catastrophic health hazard associated with their use.

    d.    Procuring and disseminating false, misleading, and biased information regarding the safety of its PRODUCTS to the public and using influence over governmental and regulatory bodies regarding their PRODUCTS.

102.    As a result of Defendants' failure to warn, Decedent was exposed to and used the PRODUCTS and was gravely harmed by her exposure and use of said PRODUCTS as described herein.

103.    On information and belief, as a proximate result of the conduct, acts, and omissions alleged herein, Plaintiff incurred medical expenses which survive the death of the Decedent. Prior to her death, Decedent suffered special damages, medical expenses, severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, and death. Plaintiff has suffered loss of care, comfort, and economic damages and other general damages as the result of the wrongful death of Decedent BEVERLY WHITE.

**COUNT 2.  STRICT LIABILITY – DESIGN DEFECT – RISK-UTILITY TEST**

104.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

105.    On information and belief, at all relevant times alleged herein, the PRODUCTS were designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to be tested, inspected or failed to be inspected, labeled, advertised, promoted, marketed, supplied, distributed, licensed, wholesaled, and sold by Defendants in the regular course of business.

106.    On information and belief, at all relevant times alleged herein, the PRODUCTS manufactured, supplied, licensed and/or placed into the stream of commerce by Defendants herein were defective and unreasonably dangerous in that:

    a.    the utility of the PRODUCTS does not outweigh the danger of developing bladder cancer when the PRODUCTS are used as intended;

    b.    the PRODUCTS are not reasonably fit, suitable or safe for their intended purpose and the foreseeable risks far exceeded the benefits associated with the design or formulation;

    c.    the PRODUCTS contained inadequate warnings or instructions; and,

    d.    the PRODUCTS contained dangerous ingredients while feasible safer alternative designs and ingredients were available.

107.    Plaintiff is informed and believes that, at all relevant times alleged herein, Defendants knew that the PRODUCTS were to be purchased and used without inspection for defects.

108.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the PRODUCTS were and are unsafe for their intended use by reason of defects in the design so that they would not safely serve their purpose, but would instead expose the users of said PRODUCTS to serious injuries.

109.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, there were practical and feasible alternative designs and formulations that would have prevented and/or significantly reduced the risk of Decedent's injuries and death,

without impairing the reasonable anticipated or intended function of the PRODUCTS. These safer alternative designs and/or formulations were economically and technologically feasible, and would have prevented and/or significantly reduced the risk of Decedent's injuries and death without substantially impairing utility.

110.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the PRODUCTS were substantially in the same condition as when they left the possession of Defendants.

111.    At all pertinent times, Decedent was exposed to and/or used the PRODUCTS in the manner that was intended which were a reasonably foreseeable and normally intended uses by Defendants, as said Defendants gave no warnings in opposition, but rather, promoted the use of the PRODUCTS.

112.    At all relevant times alleged herein, the design and/or formulation of the PRODUCTS was a substantial factor in causing harm and death to Decedent.

113.    As a legal and proximate result of the aforementioned defects in the design and/or formulation of the PRODUCTS, Decedent sustained the injuries and damages as alleged herein.

114.    On information and belief, as a proximate result of the conduct, acts, and omissions alleged herein, Plaintiff has incurred medical expenses which survive Decedent, Plaintiff has suffered and will suffer other special damages, and other general damages.

## COUNT 3.  STRICT LIABILITY – DESIGN DEFECT – CONSUMER EXPECTATIONS TEST

115.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

116.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants are the manufacturers, distributors, and suppliers of the PRODUCTS, which are within the ordinary experience and understanding of a consumer.  A consumer may reasonably believe that said PRODUCTS are designed to be and may be applied to the body without causing significant harm.

117.    California law allows a design defect claim to be proved either consumer

expectations test or the risk utility test.  As stated by the California Supreme Court:  "Notably, the Third Restatement rejects the consumer expectations test for proving design defect liability. (See Rest.3d Torts, Products Liability, §2, com. g, pp. 27-28.)  This position is contrary to California law, which allows a design defect to be shown by either the consumer expectations or the risk utility test.  (See ante, 202 Cal.Rptr3fd at p. 469, 370 P.3d at p. 1033; *Barker, supra,* 20 Cal.3d at p. 432, 143 Cal.Rptr. 225, 573 P.2d 443.)  The present case concerns only failure to warn, and we express no view on design defect liability." *Webb v. Special Elec. Co., Inc.* (2016) 63 Cal.4th 167, 184 fn 8.

118.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the PRODUCTS were defective in design or formulation in that, they did not perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way, and they were unreasonably dangerous, and more dangerous than an ordinary consumer would expect.

119.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, said PRODUCTS were inherently dangerous and harmful for their intended use, contrary to ordinary consumer expectations.

120.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, as a result of the defective condition of the PRODUCTS, Decedent suffered injuries, damages, and death as herein alleged, and the failure of the PRODUCTS to perform safely was a substantial factor in causing Decedent's harm.

121.    On information and belief, as a proximate result of the conduct, acts, and omissions alleged herein, Plaintiff has incurred medical expenses which survive the Decedent, Plaintiff has suffered and will suffer other special damages, Plaintiff has suffered and will suffer conscious pain and suffering and other general damages.

122.    On information and belief, at all relevant times alleged herein, Decedent's injuries occurred while the PRODUCTS were being used in an intended and reasonably foreseeable manner, and Defendants were aware of and intended that the PRODUCTS would be used in the manner in which the materials were actually used.

## **COUNT 4.  NEGLIGENT FAILURE TO WARN**

123.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

124.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants were negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing the PRODUCTS in one or more of the following respects:

      a.   failing to warn Decedent of the hazards associated with the use of the PRODUCTS;

      b.   failing to properly test their PRODUCTS to determine adequacy and effectiveness or safety measures, if any, prior to releasing the PRODUCTS for consumer use;

      c.   failing to properly test their PRODUCTS to determine the increased risk of bladder cancer during the normal and/or intended use of the PRODUCTS;

      d.   failing to inform ultimate users, such as Plaintiff, as to the safe and proper methods of handling and using the PRODUCTS;

      e.   failing to remove the PRODUCTS from the market when the Defendants knew or should have known the PRODUCTS were defective;

      f.   failing to instruct the ultimate users, such as Decedent, as to the methods for reducing the type of exposure to the PRODUCTS which caused increased risk of bladder cancer;

      g.   failing to inform the public in general and the Decedent in particular of the known dangers using the PRODUCTS;

      h.   failing to advise users how to prevent or reduce exposure that caused increased risk of bladder cancer;

      i.   marketing and labeling the PRODUCTS as safe for all uses despite knowledge to the contrary; and,

      j.   failing to act as a reasonably prudent company under similar circumstances.

125.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant

times alleged herein, Defendants knew, or reasonably should have known, that users, including Decedent, would not realize the dangers of using the PRODUCTS, and a reasonable manufacturer, distributor and/or seller under the same or similar circumstances would have warned of the dangers or instructed on the safe use of the PRODUCTS.

126.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, each and all of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries, damages, and death sustained by Decedent.

127.    On information and belief, at all relevant times alleged herein, Defendants knew or should have known that the PRODUCTS were unreasonably dangerous and defective when used or misused in a reasonably foreseeable manner.

128.    On information and belief, as a direct and proximate result of the Defendants' negligence in one or more of the aforementioned ways, Decedent purchased and used, as aforesaid, the PRODUCTS that directly and proximately were a substantial factor in causing Decedent to develop bladder cancer.

129.    On information and belief, as a proximate result of the conduct, acts, and omissions alleged herein, Plaintiff has incurred medical expenses which survive the Decedent, Plaintiff has suffered and will suffer other special damages, and other general damages.

## COUNT 5.  DECEIT BY CONCEALMENT

130.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

131.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants from the time that the PRODUCTS were first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, willfully deceived the Decedent and the public in general, by concealing from the, the true facts concerning the PRODUCTS, which the said Defendants had a duty to disclose.

132.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants conducted a sales and marketing campaign to promote the sale of the PRODUCTS and willfully deceived the Decedent, and the public in general as to the health

risks and consequences of the use of the PRODUCTS, which included but not limited to, the following false, deceptive, misleading, and untruthful advertisements, public statements, marketing campaigns, and promotions:

   a. failing to disclose or warn Decedent of the hazards associated with the use of the PRODUCTS;

   b. failing to properly test their PRODUCTS to determine adequacy and effectiveness or safety measures, if any, prior to releasing the PRODUCTS for consumer use;

   c. failing to properly test their PRODUCTS to determine the increased risk of bladder cancer during the normal and/or intended use of the PRODUCTS;

   d. failing to inform ultimate users, such as Decedent, as to the safe and proper methods of handling and using the PRODUCTS;

   e. failing to remove the PRODUCTS from the market when the Defendants knew or should have known the PRODUCTS were defective;

   f. failing to instruct the ultimate users, such as Decedent, as to the methods for reducing the type of exposure to the PRODUCTS which caused increased risk of bladder cancer;

   g. failing to disclose to the public in general and the Decedent in particular the known dangers of using the PRODUCTS;

   h. failing to advise users how to prevent or reduce exposure that caused increased risk for bladder cancer;

   i. marketing and labelling the PRODUCTS as safe for all uses despite knowledge to the contrary; and,

   j. failing to act like a reasonably prudent company under similar circumstances.

   133.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants were aware of the foregoing, and that the PRODUCTS were not safe, fit, and effective for use as intended.  Furthermore, said Defendants were aware that the use of the PRODUCTS was hazardous to health, and that the PRODUCTS carry a significant propensity to cause serious injuries to users including, but not limited to, the injuries suffered by

Decedent as alleged herein.

134.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, that Defendants intentionally concealed and suppressed the true facts concerning the PRODUCTS with the intent to defraud the Decedent, other consumers, and the public in general, in that said Defendants knew that Decedent would not have used the PRODUCTS if she had known the true facts concerning the risks and dangers of the PRODUCTS.

135.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, that as a result of the foregoing fraudulent and deceitful conduct by Defendants, Decedent suffered injuries, damages, and death as alleged herein.

136.    On information and belief, as a proximate result of the conduct, acts, and omissions alleged herein, Plaintiff has incurred medical expenses which survive the Decedent, Plaintiff has suffered and will suffer other special damages, Plaintiff has suffered and will suffer conscious pain and suffering and other general damages.

## COUNT 6.  VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

137.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

138.    This Count 6 is a cause of action for the violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.

139.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants from the time that the PRODUCTS were first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, willfully deceived the Decedent and the public in general, by concealing from the, the true facts concerning the PRODUCTS, which the said Defendants had a duty to disclose.

140.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants conducted a sales and marketing campaign to promote the sale of the PRODUCTS and willfully deceived the Decedent, and the public in general as to the health risks and consequences of the use of the PRODUCTS, which included but not limited to, the following false, deceptive, misleading, and untruthful advertisements, public statements,

marketing campaigns, and promotions:

    a.   failing to disclose or warn Decedent of the hazards associated with the use of the PRODUCTS;

    b.   failing to properly test their PRODUCTS to determine adequacy and effectiveness or safety measures, if any, prior to releasing the PRODUCTS for consumer use;

    c.   failing to properly test their PRODUCTS to determine the increased risk of bladder cancer during the normal and/or intended use of the PRODUCTS;

    d.   failing to inform ultimate users, such as Decedent, as to the safe and proper methods of handling and using the PRODUCTS;

    e.   failing to remove the PRODUCTS from the market when the Defendants knew or should have known the PRODUCTS were defective;

    f.   failing to instruct the ultimate users, such as Decedent, as to the methods for reducing the type of exposure to the PRODUCTS which caused increased risk of bladder cancer;

    g.   failing to disclose to the public in general and the Decedent in particular the known dangers of using the PRODUCTS;

    h.   failing to advise users how to prevent or reduce exposure that caused increased risk for bladder cancer;

    i.   marketing and labelling the PRODUCTS as safe for all uses despite knowledge to the contrary; and,

    j.   failing to act like a reasonably prudent company under similar circumstances.

141.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants were aware of the foregoing, and that the PRODUCTS were not safe, fit, and effective for use as intended.  Furthermore, said Defendants were aware that the use of the PRODUCTS was hazardous to health, and that the PRODUCTS carry a significant propensity to cause serious injuries to users including, but not limited to, the injuries suffered by Decedent as alleged herein.

142.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant

---

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL        PAGE 32 OF 42

times alleged herein, that Defendants intentionally concealed and suppressed the true facts concerning the PRODUCTS with the intent to defraud the Decedent, other consumers, and the public in general, in that said Defendants knew that Decedent would not have used the PRODUCTS if he had known the true facts concerning the risks and dangers of the PRODUCTS.

143. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, that as a result of the foregoing fraudulent and deceitful conduct by Defendants, Decedent suffered injuries, damages, and death as alleged herein

144. The foregoing fraudulent and deceitful conduct by Defendants amounts to unlawful, unfair, and fraudulent practices in violation of the UCL.

145. Defendants' acts, omissions, and practices described above constitute "unfair" practices because they are contrary to California's legislatively declared policy condemning deceptive advertising and marketing of goods and services. Defendants falsely represented the nature, quality, condition, ingredients, health hazards, and dangers posed by the PRODUCTS.

146. Defendants' conduct constitutes unfair methods of competition and business practices.

147. Defendant's acts, omissions, and practices described above are contrary to California public policy and constitute immoral, unethical, and unscrupulous practices that caused substantial injury to the Decedent.

148. All of Defendants' unlawful and unfair conduct, failures to disclose, and fraudulent practices and misrepresentations alleged herein occurred in the course of Defendants' respective businesses and were part of a generalized course of conduct.

149. Defendants' unlawful, unfair, and fraudulent conduct alleged herein was designed to and did induce Decedent to purchase the PRODUCTS.

150. Decedent would not have purchased the PRODUCTS but for Defendants' unlawful, unfair, and fraudulent business conduct.

151. As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business conduct, Decedent suffered concrete and particularized injuries, including monetary loss in the form of paying for the PRODUCTS.

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL          PAGE 33 OF 42

152.    Plaintiff is entitled to appropriate relief, including restitution, declaratory relief, and a permanent injunction prohibiting Defendants from engaging in the aforementioned practices that violate the UCL. Plaintiff further seeks reasonable attorneys' fees and costs under applicable law including California Code of Civil Procedure 1021.5.

## COUNT 7.  WRONGFUL DEATH

153.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

154.    Plaintiff is the surviving heir of Decedent, as identified above, who used the PRODUCTS and was injured and died as a result. Said Decedent purchased, was supplied with, received, applied, used and consumed said PRODUCTS as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, sold or otherwise placed in the stream of interstate commerce by Defendants, which contained the carcinogenic aromatic amines as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, sold or otherwise placed in the stream of interstate commerce by Defendants.

155.    The injuries and damages of Decedent were caused by the wrongful acts, omissions, and fraudulent misrepresentations of Defendants.

156.    As a result of the conduct of Defendants and the Decedent's use of the PRODUCTS, the Decedent suffered fatal injuries.

157.    As a result of the death of the Decedent, Plaintiff has been deprived of love, companionship, comfort, support, affection, society, solace and moral support of the Decedent.

158.    Plaintiff is entitled to recover economic and non-economic damages against all Defendants for wrongful death directly and legally caused by the defects in Defendants' PRODUCTS and the negligent conduct, acts, errors, omissions and intentional and negligent misrepresentations of Defendants, and each of them.

## COUNT 8.  SURVIVAL ACTION

159.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

160.    Decedent incurred special damages in the form of the reasonable value of services rendered for medical care for the injuries that Decedent sustained prior to death, all caused by Decedent's exposure to the PRODUCTS. Plaintiff is the personal representative or successor-in-interest and authorized to bring this survival action on behalf of the Decedent pursuant to California Code of Civil Procedure § 377.31, *et seq*.

161.    Plaintiff incurred special damages for losses sustained by Decedent in for the form of the reasonable value of services rendered for medical care for the injuries sustained by the Decedent prior to death, lost earnings and other special damages.

162.    As a direct and proximate result of the defects in the PRODUCTS and the conduct of Defendants, Plaintiff and Decedent sustained the damages as set forth above.

**TOLLING STATUTES OF LIMITATIONS AND PUNITIVE DAMAGES**

163.    Plaintiff hereby incorporates each of the preceding paragraphs as if fully set forth herein.

164.    Plaintiff suffered illnesses that have latency periods and do not arise until many years after exposure.  Plaintiff's illnesses did not distinctly manifest as having been caused by the PRODUCTS until Plaintiff was made aware that the bladder cancer could be caused by use of and exposure to the PRODUCTS.  Consequently, the discovery rule applies to this case and the statute of limitations has been tolled until the day that Plaintiff knew or had reason to know that bladder cancer was linked to the use of and exposure to the PRODUCTS.

165.    Furthermore, the running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct.   Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with the chemicals contained within the PRODUCTS.

166.    As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know, or could not have reasonably learned through reasonable diligence, that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of

Defendants' acts and omissions.

167.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth, quality and nature of the PRODUCTS. Defendants were under a duty to disclose the true character, quality and nature of PRODUCTS because this was non-public information which the Defendants had and continue to have in their exclusive control, and because the Defendants knew that this information was not available to Plaintiff.

168.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting profitable PRODUCTS, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on Defendants' representations.

169.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, in representations to the Plaintiff and the public in general, Defendants also fraudulently concealed and intentionally omitted the following material information:

a.    that the PRODUCTS were not as safe as other products available;

b.    that the PRODUCTS were dangerous; and,

c.    that the PRODUCTS were defectively and negligently designed and had defective, inadequate, and insufficient warnings and instructions.

170.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants were under a duty to disclose to Plaintiff, and the public in general, the defective nature of the PRODUCTS.

171.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants made the misrepresentations and actively concealed information concerning the safety and efficacy of the PRODUCTS with the intention and specific desire to induce the consumers, including the Plaintiff, to rely on such misrepresentations in selecting, purchasing and using the PRODUCTS.

172.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant

times alleged herein, Defendants made these misrepresentations and actively concealed information concerning the safety and efficacy of the PRODUCTS in the labeling, advertising, promotional material or other marketing efforts.

173.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, these representations, and others made by Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

174.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the misrepresentations and active concealments by Defendants were perpetuated directly and indirectly by Defendants, their sales representative, employees, distributors, agents, marketers and detail persons.

175.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the representations were made, Plaintiff did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the PRODUCTS.  Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff discover the false representations of Defendants, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendants' misrepresentations.

176.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants knew that Plaintiff, and the public in general, had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the PRODUCTS, as set forth herein.

177.    Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the PRODUCTS, Plaintiff would not have purchased, used, been exposed to, or relied on Defendants' PRODUCTS.

178.    Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, including Plaintiff.

179.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the information distributed to the public and Plaintiff by Defendants

included, but was not limited to, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards, and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the PRODUCTS.

180.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants intentionally made material misrepresentations to the medical community and public, including Plaintiff, regarding the safety of the PRODUCTS, specifically that the PRODUCTS did not have dangerous and/or serious adverse health safety concerns, and that the PRODUCTS were as safe as other products.

181.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants' intent and purpose in making these misrepresentations was to deceive the Plaintiff; to gain the confidence of the public, the medical community, and Plaintiff, to falsely assure them of the quality and fitness for use of the PRODUCTS; and induce Plaintiff and the public to use the PRODUCTS.

182.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the PRODUCTS to the public at large, for the purpose of influencing the sales of PRODUCTS known to be dangerous and defective, and/or not as safe as other alternatives.

183.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, at all times relevant to this action, Defendants knew that the PRODUCTS were not safe for consumers.

184.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the misrepresentations and active concealment by Defendants constitute a continuing tort.  Indeed, Defendants continue to misrepresent the potential risks and serious side effects associated with the use of the PRODUCTS.

185.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, as a result of the Defendants' advertising and marketing efforts, and

representations, the PRODUCTS are and continue to be pervasively manufactured and used in California and throughout the United States.

186.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the acts, conduct, and omission of Defendants, and each of them, as alleged throughout this Complaint were fraudulent, willful and malicious and were done with a conscious disregard for the rights of the Plaintiff and other users of the PRODUCTS and for the primary purpose of increasing Defendants' profits from the sale and distribution of the PRODUCTS. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against each Defendant in an amount appropriate to punish and make an example of each Defendant.

187.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, prior to the manufacturing, sale and distribution of the PRODUCTS, Defendants, and each of them, knew that the PRODUCTS were in a defective condition as previously alleged herein and knew that those who used the PRODUCTS would experience and did experience severe injuries.  Further, Defendants and each of them through their officers, directors, managers, and agents, had knowledge that the PRODUCTS presented a substantial and unreasonable risk of harm to the public, including Plaintiff and, as such, consumers of the PRODUCTS were unreasonably subjected to risk of injury.

188.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, despite such knowledge, Defendants, and each of them, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in the PRODUCTS and failed to warn the public, including the Plaintiff, of the extreme risk of injury occasioned by said defects inherent in the PRODUCTS.  Defendants and their individual agents, officers, and directors, intentionally proceeded with the manufacturing, sale, distribution and marketing of the PRODUCTS knowing that the public, including Plaintiff, would be exposed to serious danger in order to advance Defendants' own pecuniary interest and monetary profits.

189.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant

times alleged herein, Defendants' conduct was despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for safety, entitling Plaintiffs to exemplary damages under California Civil Code §3294.

190.    Plaintiff filed this lawsuit within the applicable limitations period of first suspecting that the PRODUCTS were the cause of any appreciable harm sustained by Plaintiff, within the applicable limitations period of first suspecting or having reason to suspect any wrongdoing, and within the applicable limitations period of first discovering the injuries.  Plaintiff could not, by the exercise of reasonable diligence, have discovered any wrongdoing and could not have discovered the causes of the injuries at an earlier time because the injuries occurred without initial perceptible trauma or harm and, when the injuries were discovered, the causes were not immediately known.  Plaintiff did not suspect, nor did he have reason to suspect, that wrongdoing had caused the injuries until recently.  Plaintiff filed the original action within two years of discovering the causes of action and identities of Defendants.

191.    Plaintiff had no knowledge of the defects in the PRODUCTS or of the wrongful conduct of Defendants as set forth herein, nor did Plaintiff have access to information regarding other injuries and complaints in the possession of Defendants.   Additionally, Plaintiff was prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public that the PRODUCTS are safe and free from defects, and Defendants fraudulently concealed information to allow Plaintiff to discover a potential cause of action sooner.

192.    Plaintiff has reviewed his potential legal claims and causes of action against the Defendants and intentionally chooses only to pursue claims based on state-law.  Any reference to any federal agency, regulation or rule is stated solely as background information and does not raise a federal question.  Plaintiff chooses to only pursue claims based on state law and is not making any claims that raise federal questions.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff prays for judgment against Defendants jointly and severally, and

as appropriate to each cause of action alleged and the standing of Plaintiff as follows:

      a.  Past and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial;

      b.  Past and future economic and special damages according to proof at the time of trial;

      c.  Past and future medical expenses according to proof at the time of trial;

      d.  Past and future pain and suffering damages expenses according to proof at the time of trial;

      e.  Punitive or exemplary damages according to proof at the time of trial;

      f.  Damages recoverable for the wrongful death of BEVERLY WHITE;

      g.  Attorney's fees;

      h.  For costs of suit incurred herein;

      i.  For prejudgment interest as provided by law; and,

      j.  For such other and further relief as the Court may deem just and proper.

Dated:  April 28, 2025

/s/ *Andrew Parker Felix*
ANDREW PARKER FELIX (SBN 276002)
Email: andrew@forthepeople.com
MORGAN & MORGAN, P.A.
633 West Fifth Street, Suite 2200
Los Angeles, CA 90071
Telephone: (407) 244-3209
Fax: (407) 245-3333

R. Allen Smith, Jr. (*pro hac vice forthcoming*)
THE SMITH LAW FIRM, PLLC
300 Concourse Blvd., Suite 104
Ridgeland, MS  39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426
Email: asmith@smith-law.org
*Attorneys for Plaintiff*

---

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL        *PAGE 41 OF 42*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all counts in this Amended Complaint.

Dated:  April 28, 2025

/s/ *Andrew Parker Felix*
ANDREW PARKER FELIX (SBN 276002)
Email: andrew@forthepeople.com
MORGAN & MORGAN, P.A.
633 West Fifth Street, Suite 2200
Los Angeles, CA 90071
Telephone: (407) 244-3209
Fax: (407) 245-3334


R. Allen Smith, Jr. (*pro hac vice forthcoming*)
THE SMITH LAW FIRM, PLLC
300 Concourse Blvd., Suite 104
Ridgeland, MS  39157
Telephone: (601) 952-1422
Facsimile: (601) 952-1426
Email: asmith@smith-law.org
*Attorneys for Plaintiffs*

# EXHIBIT E

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| | *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
L'OREAL USA, INC., a Delaware Corporation doing business in California, (see attached addendum for remaining Defendants)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
HOLLY WHITE, Individually, and as Successor-in-Interest of BEVERLY WHITE, Deceased

**Electronically FILED by
Superior Court of California,
County of Los Angeles
4/29/2025 2:47 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Drew, Deputy Clerk**

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Superior Court of Los Angeles County

Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA 90012

| CASE NUMBER:<br>*(Número del Caso):* |
|---|
| 25STCV12023 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Andrew Parker Felix, Morgan & Morgan, PA, 633 West Fifth Street, Suite 2200, Los Angeles, CA 90071 (407) 244-3209

| DATE: April 29, 2025 | Clerk, by | David W. Slayton, Executive Officer/Clerk of Court | , Deputy |
|---|---|---|---|
| *(Fecha)* 04/29/2025 | *(Secretario)* | S. Drew | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

| [SEAL] | **NOTICE TO THE PERSON SERVED:** You are served |
|---|---|
| | 1. ☐ as an individual defendant. |
| | 2. ☐ as the person sued under the fictitious name of *(specify):* |
| | 3. ☐ on behalf of *(specify):* |
| | under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor) |
| | ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee) |
| | ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person) |
| | ☐ other *(specify):* |
| | 4. ☐ by personal delivery on *(date):* |

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| WHITE v. L'OREAL USA, INC., ET AL. | 25STCV12023 |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

L'OREAL USA PRODUCTS, INC., A Delaware Corporation doing business in California,

WELLA PROFESSIONALS, a New York Corporation doing business in California,

COTY, INC., a Delaware Corporation doing business in California,

CLAIROL, a Connecticut Corporation doing business in California,

KOHLBERG KRAVIS ROBERT & CO. a/k/a KKR & CO., INC., a Delaware Corporation doing business in California,

BRISTOL-MYERS SQUIBB, a Delaware  Corporation doing business in California,

PROCTER & GAMBLE HAIR CARE, LLC,  A Delaware Corporation doing Business in California,

JOICO, a California Corporation doing business in California,

SCHWARZKOPF, a German Corporation doing business in California,

PRAVANA, a California Corporation doing business in California,

HENKEL a/k/a HENKEL AG & CO. KGaA, a German Corporation doing business in California,

GOLDWELL NEW YORK, a foreign company doing business in California,

COSMOPROF SERVICES USA, LLC, a California company doing business in California,

SALLY BEAUTY HOLDINGS, INC., a Texas Corporation doing business in California,

GOLDWELL, a foreign company doing business in California,

KAO CORPORATION, a foreign Corporation doing business in California,

JOHN PAUL MITCHELL SYSTEMS, a California corporation doing business in California, and

JOHN DOE CORPORATIONS 1-100, inclusive

Page _____ of _____

**Page 1 of 1**

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

# EXHIBIT F

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Spring Street Courthouse, Department 7

**25STCV12023**                                                April 30, 2025
**HOLLY WHITE, et al. vs L'OREAL USA, INC., A**                11:51 AM
**DELAWARE CORPORATION DOING BUSINESS IN**
**CALIFORNIA, et al.**

Judge: Honorable Samantha Jessner          CSR: None
Judicial Assistant: A. Rosas               ERM: None
Courtroom Assistant: T. Bivins             Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances

**NATURE OF PROCEEDINGS:** Court Order Re: Complex Determination;

This case is hereby determined to be complex within the meaning of Rule 3.400 of the California Rules of Court.

The case is ordered reassigned to Judge Samantha Jessner in Department 7 at the Spring Street Courthouse for all further proceedings and for all purposes.

The case is ordered stayed until the Initial Status Conference date. Notice of Initial Status Conference is to be given by the Clerk in Department 7. No responsive pleadings may be filed until further order of the Court. Parties may file a Notice of Appearance in lieu of an Answer or other responsive pleading. The filing of a Notice of Appearance shall not constitute a general appearance, and shall not waive any substantive or procedural challenge to the complaint. Nothing herein stays the time for filing Affidavit of Prejudice pursuant to Code of Civil Procedure section 170.6.

Pursuant to Government Code section 70616 subdivisions (a) and (b), each party is ordered to pay $1,000.00 for complex fees, payable to Los Angeles Superior Court, within ten (10) calendar days of service of this order.

Any party objecting to the complex designation must file an objection with proof of service in Department 7 within ten (10) days of service of this minute order. Any response to the objection must be filed in Department 7 within seven (7) days of service of the objection. This Court will make its ruling on the submitted pleadings.

Plaintiff is ordered to forthwith serve a copy of this minute order on all parties and file a proof of service within seven (7) days of service.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Spring Street Courthouse, Department 7

**25STCV12023**                                                              April 30, 2025
**HOLLY WHITE, et al. vs L'OREAL USA, INC., A**                               11:51 AM
**DELAWARE CORPORATION DOING BUSINESS IN**
**CALIFORNIA, et al.**


Judge: Honorable Samantha Jessner            CSR: None
Judicial Assistant: A. Rosas                 ERM: None
Courtroom Assistant: T. Bivins               Deputy Sheriff: None

Certificate of Mailing is attached.

# EXHIBIT G

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>04/30/2025<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ A. Rosas _____ Deputy |
| PLAINTIFF/PETITIONER:<br>Holly White | |
| DEFENDANT/RESPONDENT:<br>L'oréal USA, Inc., et al. | |

| CERTIFICATE OF MAILING | CASE NUMBER:<br>25STCV12023 |
|---|---|

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Court Order Re: Complex Determination;) of 04/30/2025 upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Andrew Parker Felix
Morgan & Morgan, P.A.
633 West Fifth Street, Suite 2200
Los Angeles, CA 90071

David W. Slayton, Executive Officer / Clerk of Court

Dated: 04/30/2025        By:   A. Rosas _____
                                 Deputy Clerk

CERTIFICATE OF MAILING

# EXHIBIT H

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>05/01/2025<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ A. Rosas _____ Deputy |
| PLAINTIFF/PETITIONER:<br>Holly White | |
| DEFENDANT/RESPONDENT:<br>L'oréal USA, Inc., et al. | |

| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>25STCV12023 |
|---|---|

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Court Order Re: Complex Determination;) of 05/01/2025 upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Andrew Parker Felix
Morgan & Morgan, P.A.
633 West Fifth Street, Suite 2200
Los Angeles, CA 90071

David W. Slayton, Executive Officer / Clerk of Court

Dated: 05/1/2025                    By: A. Rosas _____
                                           Deputy Clerk

**CERTIFICATE OF MAILING**

# EXHIBIT I

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Central District, Spring Street Courthouse, Department 7

**25STCV12023**                                                                    May 2, 2025
**HOLLY WHITE, et al. vs L'OREAL USA, INC., A**                                     8:42 AM
**DELAWARE CORPORATION DOING BUSINESS IN**
**CALIFORNIA, et al.**


Judge: Honorable Samantha Jessner          CSR: None
Judicial Assistant: A. Morales             ERM: None
Courtroom Assistant: T. Bivins             Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances


**NATURE OF PROCEEDINGS:** Court Order Re: Newly Assigned Case

This case has been randomly assigned to this department for all purposes.

Initial Status Conference is scheduled for 06/20/2025 at 11:00 AM in Department 7 at Spring
Street Courthouse.

At least 10 days prior to the Initial Status Conference, counsel for all parties must discuss the
issues set forth in the Initial Status Conference Order issued this date. The Initial Status
Conference Order is to help the Court and the parties manage this complex case by developing
an orderly schedule for briefing, discovery, and court hearings. The parties are informally
encouraged to exchange documents and information as may be useful for case evaluation.

Plaintiff must serve a copy of this minute order and the attached Initial Status Conference Order
on all parties and file a Proof of Service in this department within 7 days of service.

Certificate of Mailing is attached.

# EXHIBIT J

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles

05/02/2025

David W. Slayton, Executive Officer / Clerk of Court

By: _____ A. Morales _____ Deputy

COURTHOUSE ADDRESS:
Spring Street Courthouse
312 North Spring Street, Los Angeles, CA 90012

PLAINTIFF/PETITIONER:
Holly White

DEFENDANT/RESPONDENT:
L'oréal USA, Inc., et al.

| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>25STCV12023 |
|---|---|

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Court Order Re: Newly Assigned Case) of 05/02/2025, Initial Status Conference Order  upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Andrew Parker Felix
Morgan & Morgan, P.A.
633 West Fifth Street, Suite 2200
Los Angeles, CA 90071

David W. Slayton, Executive Officer / Clerk of Court

Dated: 05/2/2025

By:  A. Morales
     Deputy Clerk

**CERTIFICATE OF MAILING**

# EXHIBIT K

1
2
3
4
5
6
7

**FILED**
Superior Court of California
County of Los Angeles

**MAY 02 2025**

David W. Slayton, Executive Officer/Clerk of Court

By: A. Morales, Deputy

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF LOS ANGELES

10

11    HOLLY WHITE                    )
                                      )    Case No. 25STCV12023
12                    Plaintiff,      )
                                      )    **INITIAL STATUS CONFERENCE ORDER**
13    vs.                             )
                                      )    DATE: 06/20/2025
14    L'OREAL USA, INC.               )
                                      )    TIME: 11:00 a.m.
15                    Defendants      )
                                      )    PLACE: DEPARTMENT 7, SPRING ST.
16                                    )
                                      )    **\*\*JOINT STATEMENT DUE FIVE COURT
17                                    )    DAYS IN ADVANCE OF HEARING\*\***
                                      )
18                                    )

19    _____

20

21        This case has been assigned for all purposes to Judge Samantha P. Jessner.

22        Please read the important courtroom information for Department 7 posted on the

      court's website (www.lacourt.org) (go to "Courtroom Information on the Home page) which

23    contains answers to many frequently asked questions.

24        The Court has scheduled an Initial Status Conference on the date and at the time set

25    out above in Department 7, Second Floor, 312 North Spring Street, Los Angeles, California

26    90012.

27

28

1

1   Department 7 utilizes the LACourtConnect video and telephonic conference platform

2   for hearings. Parties and counsel are invited to appear in person or via LACourtConnect.

3   The Court has no preference. When appearing via LACourtConnect, please do so from a

4   quiet place. Rules concerning court attire apply.

5

6   ## COUNSEL TO FILE NOTICE OF APPEARANCE;

7   ## PLEADING STAY UNTIL FURTHER ORDER

8   The Court orders each defendant promptly following service of summons and

9   complaint to file a Notice of Appearance of counsel.  The Notice of Appearance does not

10  affect or prejudice any counsel's or party's legal position on any issue including without

11  limitation any jurisdictional challenge.

12  The Court hereby issues a stay on the filing and service of any other pleadings.

13  Notwithstanding the stay, (a) a party may file notice of related case and (b) a

14  plaintiff may file an amended complaint to add a PAGA claim to a wage and hour putative

15  class action provided that no answer to the original complaint has been filed.

16  The Court issues the stay to provide for an orderly schedule for briefing and

17  hearings on procedural and substantive pleadings challenges. This stay precludes without

18  limitation the filing of any demurrer, motion to strike, motion challenging the jurisdiction of

19  the Court or cross-complaint until further order of the Court.

20

21  ## DISCOVERY STAY UNTIL FURTHER ORDER

22  The Court hereby imposes a stay on all discovery proceedings until further order

23  of the Court including any obligation to make initial disclosures. This stay does not prevent

24  the parties from informally exchanging documents or information that may assist in their

25  initial evaluation of the issues presented in this case. This stay ordered by the Court for

26  purposes of case management is not a stay under Code of Civil Procedure section 583.310

27  unless the Court so orders.

28

**INITIAL STATUS CONFERENCE**

The purpose of the Initial Status Conference is to identify a fair and efficient way of proceeding with the case. The Court encourages the parties to propose approaches to case management.

The Court orders counsel for all parties to confer via telephone, videoconference or other real time technology, at least **ten court days** before the Initial Status Conference. The purpose of the meeting is to discuss the issues set out below so that counsel can prepare a Joint Statement to be filed with the Court **five court days** before the Initial Status Conference.

All parties in Department 7 must sign up with an e-service provider and activate a message board so that the Court can communicate with counsel prior to the ISC. The Court orders the parties to agree upon and sign up with an e-service provider (Case Anywhere, or File & ServeXpress) at least **five court days** before the ISC. So that the Court can promptly issue an order appointing the e-service provider, the Court orders Plaintiff's counsel to identify the selected e-service provider by sending an email to Dept. 7 at SSCDept7@lacourt.org upon agreement of an e-service provider.

Please remember that **electronic service** is not the same **as electronic filing**.

**PREPARING FOR THE ISC AND PREPARATION OF THE JOINT
STATEMENT**

Plaintiff's counsel should take the lead in preparing the Joint Statement and in ensuring that it includes a brief description of the facts and causes of action and addresses the following questions.  To the extent the parties disagree on any question, each party should set out their position in a separate paragraph beneath the issue or question heading.

1.   Are there any issues of judicial recusal or disqualification?

2.   The case type:

(a)   wage and hour class action with or without PAGA;

(b)   other class action (describe);

3

1    (c) construction defect;

2    (d) mass tort;

3    (e) insurance coverage; or

4    (f) other (describe).

5   Each party should *briefly* describe the nature of the case, and the claims and

6 defenses.  For wage and hour class actions, the parties should describe, to the extent

7 known, the nature of the defendant's business, plaintiff's relevant work duties and the

8 alleged work violation(s).

9   3. The status of service and notice(s) of appearance(s) by defendant(s).

10   4. Whether any party intends to challenge jurisdiction (subject matter or

11 personal).

12   5. The parties' selected e-service provider (Case Anywhere or File &

13 ServeXpress).

14   6. What provisions should be made for the preservation of evidence.

15   7. What provisions should be made for electronically stored evidence. [1]

16   8. Do the parties need a limited- or non-dissemination protective order? (The

17 court recommends the model protective orders found on the Los Angeles Superior Court

18 website (www.lacourt.org) under the Complex Court tab ("Civil Tools for Litigators."))

19   9. A proposed deadline for adding and serving any new parties.

20   10. Should either or both the pleading and discovery stay be lifted and, if so, when

21 and for what purposes?

22

23

24 [1] If electronically stored information must be produced, the court encourages the parties'

25 respective IT consultants/employees to participate in the meet and confer process addressing
(1) the information management systems employed by the parties; (2) the location and

26 custodians of information (including the identification of network and email servers and hard
drives maintained by target custodians); (3) the format in which electronically stored

27 information will be produced; (4) the type of ESI that will be produced, i.e., data files, emails,

28 etc.; and (5) appropriate search criteria for focused requests.

11. The identification of any "related case". (Answer question 15 for wage and hour class action/PAGA matters.)

12. A service list identifying all primary and secondary counsel along with their firm names, addresses, telephone numbers and email addresses.

13. Recommended orders to be made at the ISC.

14. Recommended date for the next status conference.

### FOR WAGE AND HOUR PUTATIVE CLASS ACTIONS/PAGA MATTERS

15. Each party should state, if known: (a) the estimated size of any putative class; (b) a description (including case numbers) of any related or potentially related cases pending in other departments of the Los Angeles Superior Court or any other court (including class actions with overlapping class definitions); and (c) whether a class representative has or is expected to file a PAGA claim either as an amendment in this lawsuit or filed separately, independent of this lawsuit—and if so, whether such separate lawsuit should be deemed related to this lawsuit; and if not, why not. (Parties are encouraged to review their obligations regarding notices of related cases.)

16. Does any party intend to move to compel arbitration? Before filing a motion to compel arbitration, the defendant must provide the plaintiff with a copy of the arbitration agreement, and meet and confer with counsel to determine whether the plaintiff will oppose the motion to compel arbitration.

The defendant so intending to move is required to provide a copy of the relevant agreements purportedly containing the arbitration provisions well before the ISC meet and confer, and plaintiff's counsel is expected to have formed a position as to whether plaintiff will or will not oppose a demand for arbitration and whether discovery should be opened relative to the subject of arbitration.

17. The parties' positions on "class list" discovery and arrangements for a *Belaire-West* notice process.

18. Are the parties committed to engage in early mediation and if so, (a) when is the mediation scheduled to occur and (b) what accommodations, if any, do they parties seek from the court?  (Note: this should be discussed with clients well in advance of the ISC so that counsel are in a position to make commitments at the ISC.)

## PLAINTIFF'S COUNSEL TO SERVE THIS ISC ORDER

The Court orders Plaintiff's counsel to serve this Initial Status Conference Order on counsel for all other parties, or if counsel's identity is not known, on the parties within seven days of service hereof.

Dated:    **MAY 0 2 2025**

_____
Samantha P. Jessner
Judge of the Superior Court

6

ISC ORDER